**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**CHRISTINA DELPRADO,**

       **Plaintiff,**

**v.**                                   **1:12-CV-00673 (BKS/RFT)**

**SEDGWICK CLAIMS MANAGEMENT**
**SERVICES, INC., UNITED HEALTH**
**GROUP INCORPORATED, UNITED**
**HEALTHCARE SERVICES, INC.,**
**UNITED HEALTH GROUP LONG**
**TERM DISABILITY PLAN, UNITED**
**HEALTH GROUP SHORT TERM**
**DISABILITY PLAN,**

       **Defendants.**

_____

**Appearances:**

For Plaintiff Christina Delprado:
**Craig Meyerson**
Office of Craig Meyerson
Airport Park
17 British American Boulevard
Latham, NY 12110

For Defendants Sedgwick Claims Management Services, Inc.,
United Health Group Incorporated, United Healthcare Services, Inc.,
United Health Group Long Term Disability Plan, and
United Health Group Short Term Disability Plan:

**William J. Anthony**
**Robert M. Wood**
**Kristi Rich Winters**
Jackson, Lewis P.C. - Albany Office
18 Corporate Woods Boulevard
Albany, NY 12211

**Hon. Brenda K. Sannes, United States District Court Judge:**

### MEMORANDUM-DECISION AND ORDER

Christina Delprado ("Plaintiff") brings this action under the Employee Retirement

Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001, *et seq.* In her Amended

Complaint, Plaintiff alleges, *inter alia*, that Sedgwick Claims Management Services, Inc., United

Health Group Incorporated, United Healthcare Services, Inc., United Health Group Long Term

Disability Plan, and United Health Group Short Term Disability Plan ("Defendants") violated

ERISA by improperly denying her short term disability ("STD") benefits and long term

disability ("LTD") benefits under the STD and LTD Plans provided by her employer United

Healthcare Services, Inc. (Dkt No. 11). Currently pending before the Court are Defendants'

motion for summary judgment (Dkt. No. 89), and Plaintiff's cross-motion for summary and

declaratory judgment and to strike certain affidavits in Defendants' motion (Dkt. No. 98). For

the reasons set forth below, Plaintiff's motion is granted in part and denied in part, and

Defendants' motion is granted in part and denied in part.

### TABLE OF CONTENTS

I. **BACKGROUND** ................................................................................................ 3
   A. Relevant Procedural History ....................................................................... 3
   B. Undisputed Material Facts .......................................................................... 4
   1) Plaintiff's Employment ............................................................................... 4
   2) Procedures for Determining Disability Claims .......................................... 4
   3) Plaintiff's First STD Claim ........................................................................ 7
      a. APS from Dr. Fishel ............................................................................ 8
      b. Denial and Appeal .............................................................................. 8
      c. Medical Records from Dr. Fishel and Dr. Huyck ............................... 9
      d. First Contact with Dr. Dorsey ......................................................... 12

| | | |
|---|---|---|
| | e. | Dr. Payne's First Report ................................................................ 12 |
| | f. | Denial of STD Appeal ................................................................... 14 |
| 4) | Plaintiff's Second STD Claim ................................................................ 15 |
| | a. | First Diagnosis of Fibromyalgia ................................................... 15 |
| | b. | Processing the Second STD Claim ................................................ 16 |
| | c. | Sedgwick Notes on Fibromyalgia ................................................. 17 |
| | d. | APS from Dr. Dorsey ................................................................... 18 |
| | e. | APS and Office Notes from Dr. Yovanoff ..................................... 18 |
| | f. | Denial of Second STD Claim ........................................................ 22 |
| 5) | Plaintiff's LTD Claim ........................................................................... 23 |
| 6) | Plaintiff's Administrative Appeals ....................................................... 24 |
| | a. | Medical Records Provided ............................................................ 24 |
| | b. | Dr. Payne's Second Report ........................................................... 26 |
| | c. | Denial of Appeals ......................................................................... 29 |
| | d. | Plaintiff's Second Level Appeals ................................................. 30 |

## II. APPLICABLE LEGAL STANDARDS ....................................................... 31

A. Summary Judgment ....................................................................................... 31
B. ERISA ............................................................................................................ 32
C. Standard of Review ........................................................................................ 33
1) Conflict of Interest ............................................................................................ 34
2) Procedural Errors .............................................................................................. 35
3) The Arbitrary and Capricious Standard of Review ........................................... 38
D. Scope of Review ............................................................................................ 38
1) Evidence Outside the Administrative Record .................................................... 38
2) Claim Notes ....................................................................................................... 40
E. Plaintiff's Motion to Strike ............................................................................ 41
1) Brandhorst Affidavit ......................................................................................... 41
2) Anthony Affirmation ........................................................................................ 42

## III. ANALYSIS ............................................................................................ 43

A. Plaintiff's First STD Claim .......................................................................... 43
1) Sedgwick's Initial Determination Was Arbitrary and Capricious .................... 43
2) Sedgwick's Appeal Decision Was Reasonable .................................................. 44
B. Plaintiff's Second STD Claim ...................................................................... 46
1) Diagnosis of Fibromyalgia .............................................................................. 46
2) The Initial Denial of Plaintiff's Second STD Claim
Was Arbitrary and Capricious ......................................................................... 47
3) The Denial of Plaintiff's Second STD Claim Appeal
Was Arbitrary and Capricious ......................................................................... 50
    a. Sedgwick Failed to Give Adequate Notice ...................................... 50
    b. The Denial Was Based On Erroneous Information ........................... 50
4) The Final Denial of Plaintiff's Second STD Claim
Was Arbitrary and Capricious ......................................................................... 53
    a. The Opinions Of Plaintiff's Physicians Were Not Properly Considered ............ 54
    b. Plaintiff's Subjective Symptoms Were Not Properly Considered ..................... 56
    c. Plaintiff Was Not Provided Adequate Notice .................................. 58

| | | |
|---|---|---|
| C. Plaintiff's LTD Claim Was Denied Unreasonably | ................................................... | 60 |
| D. Sedgwick's ERISA Liability | ..................................................................... | 61 |
| E. Plaintiff's Request for Declaratory Relief | ........................................................ | 62 |
| **IV. SUMMARY** | ................................................................................................ | **63** |
| **V. THE APPROPRIATE REMEDY** | ................................................................... | **64** |
| **VI. ATTORNEYS' FEES** | .................................................................................. | **66** |
| **VII. CONCLUSION** | ........................................................................................... | **67** |

I.      **BACKGROUND**

A.      **Relevant Procedural History**

Plaintiff commenced this action on March 20, 2012 by filing a Complaint in the Supreme

Court of the State of New York, Saratoga County. (Dkt. No 1-2). On April 23, 2012,

Defendants removed the case to the Northern District of New York on the basis that the Court

has jurisdiction under 28 U.S.C. §§ 1331 and 1332. (Dkt. No 1). On June 18, 2012, Plaintiff

filed an Amended Complaint, asserting twelve claims against Defendants under ERISA, the

Family and Medical Leave Act of 1993 ("FMLA"), and New York state law. (Dkt No. 11).

On March 20, 2013, the Court dismissed Plaintiff's fourth claim, on Defendants' motion,

for failure to state a claim upon which relief could be granted. (Dkt. No. 33). On June 30, 2014,

Defendants moved for Summary Judgment against all of Plaintiff's remaining FMLA,

employment, and ERISA claims. (Dkt. No. 89). Plaintiff opposed Defendants' motion on her

ERISA claims—Counts I, II, III, X, XI, and XII in the Amended Complaint—and cross-moved

for summary and declaratory judgment on the same ERISA claims. (Dkt. No. 98). Plaintiff

seeks to recover short-term disability (STD) and long-term disability (LTD) benefits, as well as

attorneys' fees. (Dkt. No. 98-1, at pp. 4, 33, 49). Plaintiff "requests permission of this Court to

withdraw her FMLA and employment claims--Counts V, VI, VII, VIII and IX of the Amended

Complaint—or, in the alternative, does not oppose Defendants' motion regarding said counts."

(*Id.*, at pp. 12-13).[1]  Plaintiff further moves to strike all or parts of the Affidavits of Jessica Brandhorst and William J. Anthony, which were submitted by Defendants in support of their motion.  (*Id.*, at pp. 13-14).[2]

### B.  Undisputed Material Facts[3]

#### 1)  Plaintiff's Employment

Plaintiff was hired by Defendant United Healthcare Services, Inc. ("UHS") on March 12, 2007 for the position of Disease Management Case Manager.  (Defs. SMF, p. 2, ¶ 1).  In this position, Plaintiff worked primarily from home providing disease management support to patients over the phone.  (*Id.*, p. 2, ¶ 5).  On July 30, 2010, Plaintiff stopped actively working at UHS due to allegedly worsening health issues including severe constant chronic joint pain and excessive fatigue; she requested and was granted medical leave under the FMLA starting on August 2, 2010.  (Pl. SMF, ¶¶ 26, 28, 37).

#### 2)  Procedures for Determining Disability Claims

[1] Since Plaintiff expressly does not oppose Defendants' motion on Counts V, VI, VII, VIII, and IX, those causes of action are hereby dismissed with prejudice.  *See Muench Photography, Inc. v. Houghton Mifflin Harcourt Publ. Co.*, No. 09 Civ. 2669, 2013 U.S. Dist. LEXIS 118870, at *12, 2013 WL 4464002, at *4 (S.D.N.Y. Aug. 21, 2013); *Mullin v. Rochester Manpower, Inc.*, 204 F. Supp. 2d 556, 560 (W.D.N.Y. 2002); *Hafez v. Laticrete Int'l*, No. 98 Civ. 438, 2000 U.S. Dist. LEXIS 13372, at *10, 2000 WL 1335752, at *4 (N.D.N.Y. Sept. 14, 2000); *Deleu v. Scaife*, 775 F. Supp. 712, 714 (S.D.N.Y. 1991).

[2] This matter was reassigned to the undersigned by Order of Chief Judge Gary L. Sharpe on December 29, 2014.  (Dkt. No. 108).

[3] The facts stated herein are drawn from the Administrative Record regarding Plaintiff's claims for STD and LTD benefits (hereafter "BPN"), which was submitted to the Court under seal pursuant to Local Rule 83.13 (Dkt. No. 92), and the STD and LTD Plans dated March 2010 and January 2011 (Dkt. Nos. 90-1, 90-2, 90-3).  Where appropriate, the Court will also refer to the parties' submissions in connection with their respective motions, including Defendants' Statement of Undisputed Material Facts ("Defs. SMF"), Dkt. No. 89-2; Plaintiff's Response to Defendants' Statement of Material Facts ("Pl. SMF Response"), Dkt. No. 98-6; Plaintiff's Statement of Material Facts ("Pl. SMF"), Dkt. No. 98-2; and Defendants' Response to Plaintiff's Statement of Undisputed Material Facts ("Defs. SMF Response"), Dkt. No. 104-6.  Where facts stated in a party's L.R. 7.1(a)(3) Statement are supported by testimonial or documentary evidence, and denied with only a conclusory statement by the other party, the Court has found such facts to be true.  *See* N.D.N.Y. L.R. 7.1(a)(3); Fed. R. Civ. P. 56(e).

For convenience, Defendants' Supporting Memorandum of Law (Dkt. No. 89-1) will be referred to as "Defs. Br.";  Plaintiff's Memorandum of Law  (Dkt. No. 98-1) as "Pl. Br."; Defendants' Reply Memorandum (Dkt. No. 104) as "Defs. Reply"; and Plaintiff's Response to Defendants' Reply (Dkt. No. 107) as "Pl. Response."  Unless otherwise noted, all citations to the parties' submissions reference the page numbers generated and marked by the ECF system.

During her employment at UHS, Plaintiff was eligible to file for both STD and LTD benefits under the United Health Group Short-Term and Long-Term Disability Plan (the "Plan"). (Defs. SMF, p. 8, ¶ 2). Under the Plan, Plaintiff was eligible to receive STD benefits in the amount of 60% of her pre-disability earnings in the event she became disabled, after she had been disabled for a waiting period of seven consecutive calendar days through a maximum benefit period of 180 calendar days. (Pl. SMF, ¶ 65). Plaintiff was eligible to receive LTD benefits in the amount of 60% of her pre-disability earnings in the event she became disabled, after she had been disabled for a waiting period of 180 calendar days through a maximum benefit period until she reached the age of 65. (Id., ¶ 246). The Plan also requires claimants to apply for Social Security Disability Income benefits if their physician expects them to be disabled for twelve months or more (BPN 204), and provides that STD and LTD benefits would be reduced by the amount of any Social Security disability benefits they received. (BPN 71, 85, 188, 203).

Defendant United Health Group, Inc. ("UHG") is the sponsor and named plan administrator of the Plan. (Defs. SMF, p. 10, ¶ 11). Defendant Sedgwick Claims Management Services, Inc. ("Sedgwick") is the claims administrator for STD benefits under the Plan, and also for LTD benefits for the first twenty-four months of coverage under the Plan. (Id., ¶¶ 15-16; Pl. Response, ¶¶ 15-16). UHG delegated its authority to determine claims to Sedgwick for STD benefits and for the first twenty-four months of LTD benefits. (Defs. SMF, p. 11, ¶ 20). LTD benefits after twenty-four months of coverage are administered and funded by non-party Standard Insurance Company. (Id., ¶¶ 14, 17).

The Plan provides the delegated fiduciary – in this case Sedgwick – with "the sole and exclusive authority and discretion to interpret the benefit plans' terms and benefits under them,

and to make factual and legal decisions about them." (BPN 8, 128).[4] The STD portion of the

Plan provides the following definition of "disabled": "You are unable to perform with reasonable

continuity the Material Duties of your Own Occupation because of a non-work related Medical

Condition." (BPN 97, 215). The LTD portion of the Plan provides the following definition of

"disabled":

> As a result of a Medical Condition, you are unable to perform with reasonable continuity the Material Duties of your Own Occupation (during the LTD Waiting Period and the initial 24 months of LTD Benefits) or Any Occupation (after the initial 24 months of LTD Benefits) and are unable to earn more than a specified percentage of your Predisability Earnings . . . .

(*Id*.). The Plan further states the following conditions must be satisfied before an employee is

considered disabled:

> You have been seen face-to-face by a Physician about your Disability within 10 business days of the first day of absence related to the Disability leave of absence;   Your Physician has provided Medical Evidence that supports your inability to perform the Material Duties of your Own Occupation; You are under the Regular and Appropriate Care of a Physician; and Your Medical Condition is not work-related and is a Medically Determinable Impairment.

(BPN 71, 187). For purposes of determining disability claims, the Plan further defines the

following operative terms:

> Material Duties: The essential tasks, functions and operations, and the skills, abilities, knowledge, training and experience, generally required by employers from those engaged in a particular occupation that cannot be reasonably modified or omitted. . . .
>
> Medical Condition: Illness, Physical Disease, Injury, Pregnancy, and/or Mental Disorder and Substance Use Disorder or Dependence.
>
> Medical Evidence: Clear documentation, provided by the Physician supporting your Disability, of functional impairments and functional limitations due to a Medically Determinable Impairment that would prevent you from performing the Material Duties of your Own Occupation (STD Benefits and initial 24 months of

---

[4] The Plan language cited herein is from two UHG Plan Handbooks dated March 2010 and January 2011. (Dkt. Nos. 90-1, 90-2, 90-3). Unless otherwise noted, the relevant provisions of the Plan are identical in both versions.

LTD Benefits) or Any Occupation (after initial 24 months of LTD Benefits) safely and/or adequately.

Medically Determinable Impairment: An impairment that results from anatomical, physiological or psychological abnormality which can be shown by medically acceptable clinical and laboratory diagnostic techniques. A physical or mental impairment must be established by Medical Evidence consisting of signs, symptoms and laboratory findings, and not only by the individual's statement of symptoms.

Own Occupation: Any employment business, trade, profession, calling or vocation that involves Material Duties of the same general character as the occupation you are regularly performing for UnitedHealth Group when your Disability begins. In determining your Own Occupation, the Plan Administrator is not limited to looking at the way you perform your job for your employer but may also look at the way the occupation is generally performed in the national economy. . . .

(BPN 97-99, 215-217). The Plan also provides the opportunity to appeal in the event a claim for STD or LTD benefits is denied; the March 2010 version of the Plan provided for one level of appeal, while the January 2011 version provided for two levels of appeal. (BPN 114-116, 232-234). Second level appeals were decided by the UHG Disability Appeals Committee based on a "closed file" review, meaning no new information would be considered. (BPN 234).

### 3) Plaintiff's First STD Claim

On or around August 11, 2010, Plaintiff filed a claim for STD benefits with Sedgwick, stating that as of August 2, 2010 she was disabled due to "immense" joint and muscle pain which made it hard to focus, as well as stiffness and swelling which made it hard to walk and type. (BPN 342-345). Sedgwick assigned claim number B085705482-0001-01 to Plaintiff's claim. (Pl. SMF, ¶ 74). On August 12, 2010, Sedgwick requested an authorization to obtain Plaintiff's medical records, which she returned on August 16, 2010. (BPN 561, 570-571). On August 16, 2010, Sedgwick sent a letter to Plaintiff's primary care doctor's office requesting "objective medical documentation that supports the employee's inability to return to work" in the form of

an Attending Physician Statement ("APS") and "Office Treatment Notes for the period of 08/02/2010 through present," with a due date of August 25, 2010. (BPN 566-567).

### a. APS from Dr. Fishel

On August 23, 2010, Plaintiff's primary care doctor Dr. Stephen Fishel reported in the APS that she had diagnoses of "osteoarthritis, fatigue, arthralgias[5]" and co-morbids[6] of "migraine, depression, HTN, high cholesterol, lymes disease." (BPN 596). He reported that Plaintiff had subjective complaints of fatigue and joint pain. (BPN 597). In response to the question "How does this affect the patient's ability to function?," Dr. Fishel answered, for both work and home, "fatigue, diffuse joint pain worse in extremities, exacerbated by moving." (*Id.*). He reported that he had referred Plaintiff to Dr. Christopher Huyck, a Rheumatologist. (BPN 598). Dr. Fishel also stated that Plaintiff "is unable to perform her current job." (*Id.*).

### b. Denial and Appeal

On August 25, 2010, Sedgwick recorded Dr. Fishel's APS information, and then called Dr. Fishel and Dr. Huyck, leaving voicemail messages to call back or to fax treatment notes relating to Plaintiff immediately, since the "MDD[7] is 8/25." (BPN 338). On August 27, 2010, before receiving treatment notes from Dr. Fishel or Dr. Huyck, Sedgwick sent a letter to Plaintiff informing her that her claim had been denied, stating:

> The Sedgwick CMS Claims Unit has completed a review of your claim for benefits under UnitedHealth Group's Short-Term Disability Plan. At this time, it has been determined that you do not qualify for disability benefits under the Plan.

---

[5] Arthralgia is defined as pain in one or more joints. *See* Merriam-Webster Medline Plus Medical Dictionary, *Arthralgia*, http://www.merriam-webster.com/medlineplus/arthralgia (last visited April 16, 2015).

[6] Co-morbid is defined as existing simultaneously with, usually independently of, another medical condition. *See* Merriam-Webster Medline Plus Medical Dictionary, *Comorbid*, http://www.merriam-webster.com/medlineplus/co-morbid (last visited April 16, 2015).

[7] Although not explained by the parties, "MDD" appears to refer to the due date for medical records. *See* BPN ("The requested information is due in our office by 8/25/2010.").

As a result, your claim for benefits is denied for the period beginning 8/2/2010 through ongoing.

The medical information submitted does not demonstrate that you are unable to perform the material duties of your own occupation and/or that you are under the regular and appropriate care of a physician as required.

Our review included the following: An Attending Physician Statement Signed 8/23/2010 by Dr. Fisher [sic].

(BPN 590).

Plaintiff appealed the decision by faxing a letter to Sedgwick on August 29, 2010, which stated: "I am appealing the denial which was filed due to previous request to Dr. Fishel, MD my PCP, by myself and Sedgewick [sic] CMS that doctor's notes from 8/2/2010 through present be faxed to Sedgewick [sic] CMS, however were never received. I have faxed Dr. Fishel and made a 2nd request for these doctor's notes to be faxed immediately." (BPN 585-86).

### c. Medical Records from Dr. Fishel and Dr. Huyck

On August 30, 2010, Sedgwick received records regarding Plaintiff from Dr. Fishel dated August 3, 2010, August 6, 2010, and August 27, 2010. (BPN 628-634). The office note from August 3, 2010 states in relevant part:

In for sick visit. Usually sees Dr. Mustafa. Today she complains of diffuse increased joint pain. She says she has been generally doing worse over the last six months. Over this past weekend she had acutely worse joint pain and extreme fatigue. Saturday she said everything hurt and she couldn't move. Says nothing helped her pain (NSAID's [sic], has Hydrocodone). Felt subjectively feverish all weekend. Did take one temp in the middle of the night, was 100.8. Today she continues to have diffuse pain in multiple joints. Says feels stiff in the morning. She says she is finding it harder to work. Apparently she used to work at home, but is now required to come in to the office. Is finding it hard to keep up with those demands due to her pain and fatigue.

She has a longstanding history of chronic pain, mostly neck and in legs. She did have an episode of Lyme disease that appears to have been successfully treated in fall 2009. She has been seen by Dr. Huyck (rheum) several times since fall 2009. We don't appear to have any of his notes available. Patient is not sure whether she has been given a formal rheumatologic diagnosis. She last saw him May 2010.

> She saw Dr. Mustafa in mid-July with complaints of fatigue. No labs done at that time. Previous labs done in May show normal CBC, chemistries, and TFT's. Had pretty complete set of rheumatologic labs in April which showed positive RF (480) but everything else negative/normal.

(BPN 633). Dr. Fishel's assessment was "719.49 Pain Joint Multiple Sites." He also commented that Plaintiff's "diffuse antralgias" appeared "to be progressing gradually over time," and that it was [n]ot clear whether she has a true connective tissue disorder or just osteoarthritis that's worsening." (BPN 634). Plaintiff returned to see Dr. Fishel on August 6, 2010, complaining of "pain all over," and "[n]o relief with increase in meds." (BPN 631-632). Dr. Fishel's comments included "[d]iffuse arthralgias, fatigue, chronic pain." (BPN 631). Dr. Fishel noted "I'm unsure whether she has a true connective tissue disease or not." (*Id.*). The note also indicates that Plaintiff agreed to try Prednisone, and Dr. Fishel observed: "We did discuss possibly trying Savella (although I don't think she's typical for fibromyalgia), but she doesn't think she would want to do that." (BPN 631-632).

When Plaintiff saw Dr. Fishel again on August 27, 2010 for "follow up of joint issues," Dr. Fishel commented that Plaintiff "[c]ontinues with diffuse arthralgias and fatigue, etiology uncertain." (BPN 629-630). Plaintiff reported that she "felt so bad [she] was in bed for two days." (BPN 629). Dr. Fishel stated that "[s]ince last visit she has been formally taken out of work by me. Tentative return date estimated at 9/30." (*Id.*). Dr. Fishel again assessed "719.49 Pain Joint Multiple Sites" and recommended that Plaintiff see another Rheumatologist. (*Id.*).

On September 7, 2010, Sedgwick received medical records from Plaintiff's Rheumatologist, Dr. Huyck, recording office visits on January 20, 2010, February 2, 2010, and April 1, 2010. (BPN 605-618). According to Dr. Huyck's January 20, 2010 office note, Plaintiff complained of suffering "very severe" diffuse muscle and joint pain over the last several years. (BPN 606). Dr. Huyck assessed "[d]iffuse and somatic pain with mild defuse underlying

osteoarthritis and spondylosism" and noted that Plaintiff "may well have predominantly a fibrositic[8] syndrome."  (BPN 608).  On February 2, 2010, Plaintiff reported that she continued to "experience diffuse pain especially of her hands and knees."  (BPN 610).  On physical examination, Dr. Huyck found no tenderness, swelling, inflammation, or limited range of motion in any body areas.  (BPN 611).  Dr. Huyck's impression was "Generalized osteoarthritis, rule out possibly early inflammatory arthritis."  (BPN 612).  Plaintiff saw Dr. Huyck again on April 1, 2010, with "partial improvement in her generalized discomfort" due to medication and continued weakness.  (BPN 613)  The physical exam again was unremarkable.  (BPN 614).  Dr. Huyck's impression was "[h]istory of positive ANA[9] and poly arthralgias."  (*Id*.).

On September 17, 2010, Sedgwick received additional medical records from Dr. Fishel, documenting visits by Plaintiff on May 20, 2010 and July 19, 2010.  (BPN 656-661).  Dr. Fishel recorded on May 20, 2010 that Plaintiff "still complains of a lot of joint pain. She does have Lyrica which she will take for pain. She does not take the Lyrica daily because it is too expensive. When she does take it, she feels better."  (BPN 657).  Dr. Fishel observed that Plaintiff's physical exam was normal and advised her to take Lyrica daily.  (BPN 658).  On July 19, 2010, Plaintiff presented "with pain and with depression" (BPN 660), and told Dr. Fishel that "[s]he had been on hydrocodone 1-2 tablets daily" for pain.  (*Id*.).  Plaintiff's physical exam was normal again, and Dr. Fishel assessed "719.49 Pain Joint Multiple Sites."  (BPN 661).

On September 21, 2010, Sedgwick also received another APS by Dr. Fishel dated that day, prepared for the Hartford Life Insurance Company, which stated a primary diagnosis for

---

[8] Fibromyalgia is also commonly referred to as fibrositis.  *See Green-Younger v. Barnhart*, 335 F.3d 99, 101 n.1 (2d Cir. 2003).

[9] ANA refers to Antinuclear Antibodies.
http://www.rheumatology.org/Practice/Clinical/Patients/Diseases_And_Conditions/Antinuclear_Antibodies_(ANA)/ (last visited April 16, 2015).  These antibodies target "normal" proteins within the nucleus of a cell and could signal the body to begin attacking itself, which can lead to autoimmune diseases. A positive ANA test means only that the antibodies are present, not necessarily that the disease is present.  *Id*.

Plaintiff of "arthritis" and a secondary diagnosis of "fatigue." (BPN 674). Dr. Fishel noted Plaintiff's reported symptoms at the time were "fatigue" and "joint pain." (*Id.*). Dr. Fishel stated that Plaintiff was unable to return to work, and that he expected her situation to last through September 30, 2010. (*Id.*). He also reported that Plaintiff had been referred to a Rheumatologist for evaluation. (*Id.*).

### d.    First Contact With Dr. Dorsey

On September 21, 2010, Sedgwick received a fax from Dr. Susan Dorsey, Plaintiff's new primary care doctor, which stated "Christina Delprado is a patient of our practice. She is being evaluated for a rheumatologic condition and will be out of work through her consultation with rheumatology 10/29/10. Please contact the office if you have any questions regarding this correspondence." (BPN 673).[10]

### e.    Dr. Payne's First Report

On September 27, 2010, Sedgwick received an independent report from Dr. Dennis Payne, Jr., a physician board certified in Internal Medicine and Rheumatology, with whom it had consulted regarding Plaintiff's condition. (BPN 651-655). Dr. Payne reported that he had made three unsuccessful attempts to speak with Dr. Fishel by telephone. (BPN 652). There is no indication that Dr. Payne attempted to speak with Dr. Huyck or Dr. Dorsey, and Dr. Payne did not speak with or examine Plaintiff. (*See* BPN 651-655). Dr. Payne reviewed the following medical records: Progress Notes from Dr. Huyck from 1/20/10-4/01/10, Progress Notes from Dr. Fishel from 8/03/10-9/21/10, Case Notes from the claim log, test results from 1/20/10, and other miscellaneous records. (BPN 652). In his synopsis, Dr. Payne stated:

---

[10] Plaintiff alleges that Sedgwick also received notes from Dr. Dorsey on September 21, 2010 indicating her diagnosis of fibromyalgia and objective findings of tender points (Pl. SMF, ¶ 152), but there is no evidence of any such communication in the Administrative Record, which indicates that Dr. Dorsey's September 13, 2010 note diagnosing Plaintiff with fibromyalgia was not received by Sedgwick until December 23, 2010. (BPN 772-774).

Christina Delprado is a female with a history of reported osteoarthritis, fatigue, migraine headaches, depression, hypertension, and elevated cholesterol. The medical record data also suggest the possible diagnosis of rheumatoid arthritis as well as a history of possible Lyme disease in the past. The onset of her symptomatology based on the medical record data reviewed is over a period of several years. I did not see any specific features of inflammatory joint disease in the historical data. There is minimal mention of any degenerative findings in the historical data. I found no descriptions of any cardiac, pulmonary, gastrointestinal, or neurological historical features that would be restricting or limiting.

The workup data includes a positive ANA and a positive rheumatoid factor. She had some radiographs in January 2010 including hand x-rays, which were normal. Knee x-rays revealed mild-to-moderate osteoarthritis. She had cervical spine x-rays and lumbar spine x-rays, which revealed very mild degenerative disease, not uncommon with her age. There is also mention of a previous surgical intervention in the lumbar spine as noted on the films. A bone density study from January 2010 revealed osteopenia. Electrodiagnostic studies of the left upper extremity revealed evidence of a proximal median neuropathy.

The examination findings include some information from January 2010 until 08/27/10. The descriptions are those of findings of fibromyalgia and very mild degenerative disease. There is description of tender points. There is no mention of synovitis, weakness, or atrophy. There is no abnormality on any of the neurological exams provided, which is consistent with the electrodiagnostic studies noted above. There was no mention of any findings in the cardiac or pulmonary systems that would be restricting or limiting…

(BPN 652-653). Dr. Payne concluded, "Based on the medical record data provided for review, the employee is not disabled from her regular unrestricted job from 08/02/10 to the present."

(BPN 653). Dr. Payne responded as follows to the Examiner's Question 3, which requested, "What are the clinical findings contained in the medical record and how would these findings impact the employee's ability to function in her regular unrestricted occupation?"

The clinical findings in this medical record from a rheumatology viewpoint essentially include historical features of diffuse joint pain with no clear inflammatory component. The workup data documents mild degenerative findings in her cervical spine, lumbar spine, and knee. She has electrodiagnostic studies showing some evidence of a proximal median nerve compression process but no clinical findings supporting this. Her ANA is positive and she also has a positive rheumatoid factor with descriptions of hand edema and leg edema, but no specific features were made in regards to this. Neither of these laboratory values appears

to be supportive of any historical or clinical findings. The exam findings are minimal other than the presence of changes of mild osteoarthritis and some findings consistent with a form of fibromyalgia syndrome. Summarizing, the clinical findings in the case do not support restrictions or limitations on activities.

(BPN 653-654). Dr. Payne responded as follows to the Examiner's Question 6, which requested, "What restrictions/limitations, if any, are medically supported for the employee, for any specific time period from 08/02/10 to the present?:"

The medical record data provided does not contain findings that would support any restrictions or limitations on activities for any time period contained in the medical record data. Therefore, she would be expected to be capable of unrestricted work from 08/02/10 to the present.

(BPN 654). Dr. Payne further summarized his conclusion as follows:

A complete and thorough review of the medical record data provided in this case has been completed. The information submitted notes diagnoses of osteoarthritis, depression, hypertension, and elevated cholesterol. There is also mention of headaches. The data reveals a positive ANA and a positive rheumatoid factor but no historical, workup data, or exam findings that support the presence of any ANA or rheumatoid factor related disease process. Her exam findings are essentially remarkable only for the presence of mild osteoarthritis. None of the findings would be restricting or limiting. In summary, there is no evidence, from a rheumatology viewpoint, that Ms. Delprado would have any restrictions or limitations on activities from 08/02/10 to the present.

(*Id.*).

### f.    Denial of STD Appeal

On or around October 13, 2010, Sedgwick sent a letter to Plaintiff informing her that the denial of STD benefits had been upheld. (BPN 691-693). The letter explained that an "Appeals Specialist has reviewed the claim, including medical documents from C. Huyck, M.D., and S. Fishel, M.D., dated from January 20, 2010 through September 21, 2010." (BPN 691). The letter further explained that the "file was referred to an independent medical specialist, D. Dennis Payne, M.D., who is Board Certified in Rheumatology, for review." (*Id.*). The denial letter summarized Dr. Payne's conclusions as follows:

Dr. Payne concluded that based on the medical record data provided for review, you are not disabled from your regular unrestricted job from August 2, 2010 to the present. The information submitted notes diagnoses of osteoarthritis, depression, hypertension, and elevated cholesterol. There is also mention of headaches. The data reveals a positive antinuclear antibody (ANA) and a positive rheumatoid factor, but no historical, workup data, or examination findings that support the presence of any ANA or rheumatoid factor related disease process. Your examination findings are essentially remarkable only for the presence of mild osteoarthritis. None of the findings would be restricting or limiting. In summary, there is no evidence, from a rheumatology viewpoint, that you would have any restrictions or limitations on activities from August 2, 2010 to the present.

(BPN 691-692). The letter concludes:

We have determined that the medical information submitted does not demonstrate that you were unable to perform the material duties of your own occupation. As such, your claim for Short Term Disability benefits remains denied for the period from August 2, 2010 until your full-time return to work date.

This represents Sedgwick CMS final decision with respect to your STD claim.

(BPN 692).

### 4) Plaintiff's Second STD Claim

#### a. First Diagnosis of Fibromyalgia[11]

On December 21, 2010, Plaintiff filed another claim for STD Plan benefits, this time with a reported diagnosis of fibromyalgia, and a date of disability of August 2, 2010.[12] (BPN 405). Sedgwick assigned claim number 30101206852-0001 to this claim.[13] (*Id.*). On December 22, 2010, Sedgwick sent a letter to Dr. Dorsey requesting "objective medical documentation that

---

[11] "Fibromyalgia is a disorder of unknown etiology characterized by widespread pain, abnormal pain processing, sleep disturbance, fatigue and often psychological distress." (Dkt. No. 98-5, p. 140 (citing the Centers for Disease Control and Prevention, at http://www.cdc.gov/arthritis/basics/fibromyalgia.htm)).

[12] Plaintiff alleges that she initiated the second STD claim on or about October 28, 2010 (Pl. SMF, 153), however, the Administrative Record only indicates that Plaintiff believed that she had been diagnosed with fibromyalgia on October 28, 2010 and later communicated this information to Sedgwick in December 2010. (*See* BPN 399-400). Consequently, Sedgwick reviewed Plaintiff's claim for the period beginning October 28, 2010. (*See* BPN 880).

[13] Although Plaintiff lists the claim number for her second STD claim as 30101206852-001 in the Amended Complaint and elsewhere, the Administrative Record shows that the correct claim number is 30101206852-0001. *See, e.g.,* BPN 405, 1175.

supports the employee's inability to return to work," in the form of an APS, "Office Treatment Notes for the period of 07/15/2010 through present," and Diagnostic Testing information. (BPN 768). On December 23, 2010, Sedgwick received office notes from Dr. Dorsey dated September 13, 2010, December 7, 2010, and December 15, 2010. (BPN 773-789). Plaintiff reported on September 13, 2010 that she "has pain that she describes as like fire everywhere," and "extreme fatigue," among other symptoms. (BPN 773). The notes further state: "She is in constant pain. She has seen a rheumatologist Dr. Hike [sic] who prescribed NSAIDs. He was unsure what she had." (BPN 774). Dr. Dorsey provided the following assessment: "Joint pain, fatigue – get labs – She has tender points. She seems to definitely has [sic] fibromyalgia. Get records to see whether she has rheumatoid arthritis – not on exam apparent. She may need a second rheumatology opinion." (*Id*.).

Dr. Dorsey's offices notes for Plaintiff from December 7, 2010 and December 15, 2010 record that Plaintiff reported pain and fatigue and refer to an additional possible diagnosis of rheumatoid arthritis; they do not specifically mention fibromyalgia. (BPN 779-781, 786-787).

### b.    Processing the Second STD Claim

On December 27, 2010, Sedgwick temporarily closed Plaintiff's second claim on the ground that it was duplicative of the original STD claim. (BPN 399-401). However, after speaking with Plaintiff, Sedgwick re-opened the claim on December 30, 2010, noting: "processing for new [diagnosis] as of 10/28 of Fibromyalgia (previous claim was reviewed for the diagnoses of: osteoarthritis, depression, hypertension, and elevated cholesterol.") (BPN 399). Sedgwick then started its review to "see if medical supports back to 10/28/10," (BPN 398), and sent a blank APS to Dr. James Yovanoff and Dr. Dorsey and requested office notes from "10/15/10 to present." (BPN 397).

### c.    Sedgwick Notes on Fibromyalgia

On December 30, 2010, the reviewing Nurse Case Manager ("NCM") summarized the

status of Plaintiff's Second STD claim.  (BPN 393-397).  The NCM noted that Plaintiff

"originally claimed disability with FDA 8/2/10 because of a flare in chronic pain and fatigue

complaints."  (BPN 393).  The NCM summarized Plaintiff's available medical records and noted

that Plaintiff "has a treating history with diagnoses from possible lyme's [sic] disease,

rheumatoid arthritis and chronic pain and fatigue complaints."  (BPN 394).  The NCM noted:

> The medical records available document subjective complaints of chronic pain
> and fatigue without any objective findings such as muscle atrophy, muscle spasm,
> sensory or strength loss, range of motion deficits, abnormal movement or any
> objective findings to substantiate any functional disability.

(BPN 395).  Regarding Plaintiff's "new diagnosis of fibromyalgia," the NCM commented that

"fibromyalgia is nothing more than a chronic pain condition," but it "does require you meet

specific criteria."  (*Id*.).  The NCM then listed the following diagnostic information from the

American College of Rheumatology 1990 Criteria for the Classification of Fibromyalgia:

> History of widespread pain has been present for at least three months.
> Definition: Pain is considered widespread when all of the following are
> present:
> Pain in both sides of the body
> Pain above and below the waist
> In addition, axial skeletal pain (cervical spine, anterior chest, thoracic spine or
> low back pain) must be present. Low back pain is considered lower segment pain.
>
> Pain in 11 of 18 tender point sites on digital palpation
> Definition: Pain, on digital palpation, must be present in at least 11 of the
> following 18 tender point sites:
> Occiput (2) - at the suboccipital muscle insertions.
> Low cervical (2) - at the anterior aspects of the intertransverse spaces at C5-C7.
> Trapezius (2) - at the midpoint of the upper border.
> Supraspinatus (2) - at origins, above the scapula spine near the medial border.
> Second rib (2) - upper lateral to the second costochondral junction.
> Lateral epicondyle (2) - 2 cm distal to the epicondyles.
> Gluteal (2) - in upper outer quadrants of buttocks in anterior fold of muscle.
> Greater trochanter (2) - posterior to the trochanteric prominence.

Knee (2) - at the medial fat pad proximal to the joint line.

Digital palpation should be performed with an approximate force of 4 kg. A tender point has to be painful at palpation, not just "tender."

(BPN 395-396).   The NCM noted that "the medical records of Dr. Yovanoff will need to be assessed for that criteria," and "[w]ithout that support there is no new diagnosis."  (*Id*.).

### d.    APS from Dr. Dorsey

On January 7, 2011, Sedgwick received an APS from Dr. Dorsey regarding Plaintiff's condition.[14]  (BPN 818-821).  Dr. Dorsey stated one diagnosis for Plaintiff: fibromyalgia.  (BPN 818).  In the Supportive Findings section, Dr. Dorsey listed Plaintiff's subjective complaints as "pain everywhere, fatigue."  (BPN 819).  For the "Objective" supportive findings, which were to include "physical examination results, test results, etc.," Dr. Dorsey listed "Tender points."  (*Id*.). In response to the question "How does this affect the patient's ability to work?", Dr. Dorsey stated: "Severe Pain. She gets fatigued. Must avoid lifting, bending, sitting, walking."  (BPN 819).  Dr. Dorsey further stated that Plaintiff was totally disabled from work, with a return to work date unknown, and that she had been referred to Dr. Yovanoff, a Rheumatology specialist. (BPN 820).

### e.    APS and Office Notes from Dr. Yovanoff

On January 7, 2011, Sedgwick also received an APS from Dr. Yovanoff.  (BPN 830-833).  Dr. Yovanoff identified the following diagnoses for Plaintiff: Osteoarthritis of knees,

---

[14] Defendants argue erroneously in their moving papers that Sedgwick did not receive Dr. Dorsey's APS until January 21, 2011, i.e. after the January 20, 2011 letter denying the second STD claim.  (*See* Defs. Br., p. 36 n.10). However, the record shows that Sedgwick received the APS via fax on January 7, 2011 (BPN 816-821), and Defendants' own statement of undisputed material facts acknowledges that Sedgwick received Dr. Dorsey's APS on January 7, 2011.  (Defs. SMF at 32, ¶ 91.)

Chronic myofascial[15] pain, Chronic neck pain with cervical radiculopathy.  (BPN 830).  In the Supportive Findings section, Dr. Yovanoff wrote "see attached notes."  (BPN 831).  Dr. Yovanoff stated that the period Plaintiff was totally disabled from work was from August 2, 2010 to "indefinable," with a return to work "not expected."  (BPN 832).

On January 13, 2011, Dr. Yovanoff provided the office notes supporting his APS.  (BPN 836-843).  Plaintiff first saw Dr. Yovanoff on October 28, 2010, and the note from that date states that Plaintiff "continued to have generalized pain in different muscle groups and joints to the point where the pain was interfering with her ability to concentrate on her job which involves telephone counseling as a registered nurse."  (BPN 840).  Under "Joint Examination," Dr. Yovanoff stated as follows:

> Shoulders had full abduction, she did that with pain. She had good strength at 90 degrees without pain. There is no swelling in the elbows or wrists, MP joints have slight fullness with little bit of tenderness but she can make a full fist. It is difficult to know if this finding was obesity or synovial change. Hips, knees and ankles have full range of motion, she complained of pain in the knees with any type of manipulation. She had non-pitting edema in the legs. Reflexes were symmetrical.

(BPN 841).  Dr. Yovanoff's impression was:

> This woman with a nearly year and half history of generalized pain. Her physical exam is problematic with respect to synovitis[16] in the hands versus Myofascial pain. She has a previously high titer rheumatoid factor that had declined. She has a background history of Osteoarthritis of the knees, what sounds like cervical radiculopathy and chronic low back pain post lumbar surgery.

(BPN 841-842).  Dr. Yovanoff advised Plaintiff that the diagnosis for her condition was "undefined at the present time."  (BPN 842).

---

[15] Myofascial is defined as relating to the fasciae (connective tissue) of muscles.  *See* Merriam-Webster Medline Plus Medical Dictionary, *Myofascial*, http://www.merriam-webster.com/medlineplus/myofascial (last visited April 16, 2015).

[16] Synovitis is defined as inflammation of a synovial membrane usually with pain and swelling of the joint.  *See* Merriam-Webster Medline Plus Medical Dictionary, *Synovitis*, http://www.merriam-webster.com/medlineplus/synovitis (last visited April 16, 2015).

In the November 30, 2010 note, Dr. Yovanoff recorded that Plaintiff "returns for follow-up of difficult to explain pain." (BPN 839). He noted: "She has no swollen joints at all that can be identified clinically, but she complains of pain bitterly with manipulation of any area. Surprisingly, she really doesn't have soft tissue tender points. There is no edema in the legs."

(*Id.*). Dr. Yovanoff's assessment and plan were as follows:

> She has a greater than one year history of an undefined pain syndrome. She may have some osteoarthritis of the knees. She is focusing on the fact that she had Lyme disease a year ago, but we don't have any data on that. She had a prior rheumatologic evaluation by which she got very confused and did not have a definitive diagnosis.
>
> At this point I don't find any evidence that she really has synovitis. Although she had a strongly positive rheumatoid factor on one determination in the past, it has gotten consistently lower and is now negative suggesting that perhaps she had some type of inflammatory or infectious process that is resolved but undefined.
>
> I advised her that steroids are not medications we should use in this circumstance without a diagnosis, so she will taper it by 5 mg every five days until she is off of it. She will return in three weeks to be re-examined and obtain her prior Lyme antibody studies from her previous rheumatologic evaluation. She has been placed on temporary disability through the 28th of December. Her symptomatology persists as far as pain is concerned, and she says she really can't work under the circumstance. In the absence of a diagnosis other than chronic unexplained pain, I am in agreement with maintaining her on disability until we can determine a diagnosis if possible.

(*Id.*). Dr. Yovanoff recorded Plaintiff's December 21, 2010 visit as follows:

> She returns for follow-up of difficult to explain pain. She has had courses of Prednisone that she said reduced her pain from 8/10 to 6/10. I wanted to see her without any influence of steroids, and she has been off of them for three weeks. She has debilitating pain in her shoulders and knees.
>
> Shoulders have full abduction with good strength, but they are painful. She has no swelling or tenderness in the elbows, wrists or fingers. Knees have small effusions. There is no edema in the legs. Review of her medications indicates Lyrica 150 mg twice daily. Increased that level as of October 28th which she says has been quite helpful in controlling her pain. Simvastatin, hydrochlorothiazide, Effexor, hydrocodone and Trazodone.

She may have more of a myofascial pain syndrome superimposed on cervical radiculopathy with permanent nerve damage of the left arm and osteoarthritis of the knees. There is no evidence that she has an inflammatory syndrome based on her recent laboratory studies. Her rheumatoid factors have become negative, so we cannot confirm rheumatoid arthritis.

I advised her that we should avoid steroids. To try to manage her pain better, she will increase the Lyrica to 150 mg three times daily. She is going to have x-rays of her knees done and reports sent here. At this point she appears to be unable to return to any type of gainful employment, so I would be in agreement with her considering long term disability.

(BPN 838).

On January 14, 2011, the Sedgwick NCM recorded the following review of Dr.

Yovanoff's notes:

Dr. Yovanoff [sic] initial evaluation was on 10/28/10 with subsequent office visits on 11/30 and 12/21. The diagnosis of fibromyalgia is never once mentioned in Dr. Yovanoff's medical records. There is never a discussion of it being a potential diagnosis in the medical records, and there is no documented physical exam for fibromyalgia.

Based on the complete absence of the word fibromyalgia from any record there is no support for that diagnosis as claimed by the [employee].

In fact…Dr. Yovanoff [sic] diagnosis is stated as, "She may have more of a myofascial pain syndrome superimposed on cervical radiculopathy with permanent nerve damage of the left arm and osteoarthritis of the knees." In layman's terms the [employee] has chronic pain without objective findings on physical exam.

As such the medical records continue to substantiate no functional deficit, and the additional medical records support prior denial.

(BPN 379-380). On January 18, 2011, the NCM spoke with Dr. Yovanoff regarding Plaintiff's

condition and recorded the following summary:

I asked if he had diagnosed the [employee] with fibromyalgia and Dr. Yovanoff stated no. The diagnosis is chronic fascial pain syndrome.

Asked what was limiting the [employee] from performing telephonic nurse management from a home office. Dr. Yovanoff stated pain was the limiting factor stating the [employee] states her pain interferes with her ability to concentrate and

do her job. I asked if Dr. Yovanoff could state any objective findings that was [sic] keeping [employee] from completing the job functions of a home office based telephonic nurse case management and he said no. The [employee] has knee problems that would not effect [sic] a sedentary position.

Asked what the treatment plan was for the patient and Dr. Yovanoff stated to continue Lyrica, hydrocodone and her Effexor. No therapy is planned.

Explained the contract required objective findings to substantiate functional disability. Dr. Yovanoff stated pain was the limiting factor for the disability.

I asked if Dr. Yovanoff had anything additional to provide and he said no, but he stated he believes the [employee] is disabled because of pain because she states she is disabled.

(BPN 373).

### f.    Denial of Second STD Claim

On January 20, 2011, the Sedgwick Examiner recorded the following rationale for

denying Plaintiff's second STD claim:

> [Employee]'s original STD claim from 8/10 was denied for chronic pain syndrome due to medical did not support. [Employee] filed new claim from 10/28/10 stating that she had a new [diagnosis] of fibromyalgia. [P]er the medical records received and 01/18/11 telephone conversation with Dr. Yovanoff, [employee] does not have a new [diagnosis] of fibromyalgia and he has [diagnosed] her with chronic pain syndrome. He stated her subjective complaints of pain is [sic] what is preventing her from performing her sedentary (work at home) duties of a case manager. No objective findings to support why she cannot perform sedentary job duties.

(BPN 378-379).  On January 21, 2011, Sedgwick informed Plaintiff of the denial by phone, with

the conservation summarized as follows:

> PC to [employee] and informed her that we were not able to authorize benefits as Dr. Yvonoff [sic] stated that she does not have the [diagnosis] of fibromyalgia and she does not have a new [diagnosis]. She started crying and stated he is worthless. She wanted to know what Dr. Dorsett [sic] notes from 1/19/11 stated.[17] CM informed her that we did not receive any medical information from that provider for that date. She stated she had called and [spoken with] CSR on 1/19 and they informed her that a 3 page fax from Dr. Dorsett [sic] was received.

---

[17] The record indicates that this note from Dr. Dorsey was not received by Sedgwick until Plaintiff submitted it with her appeal on June 22, 2011. (BPN 965-966).

CM checked through SIR and the notes and stated we had received duplicate medical from Dr. yvonoff [sic] but not Dr. Dorsett [sic]. She stated Dr. Dorsett [sic] stated that chronic pain syndrome can apply to anything. She made a special trip to have labs drawn. She stated that we are messing with her and why can I not see that fax. She is calling her MDO and inquiring if they faxed the medical. Tried to explain the appeals process to her and she stated she will not go through that again. She has no money and she will be dead by then and hung up the phone.

(BPN 367-368).

The denial letter from Sedgwick to Plaintiff, which is dated January 20, 2011, states in relevant part:

At this time, it has been determined that you do not qualify for disability benefits under the Plan. As a result, your claim for benefits is denied for the period beginning 10/28/10.

We have determined that the medical information submitted does not demonstrate that you are unable to perform the material duties of your own occupation.

Our review included the following:
• Office Visit Note from Dr. Yovanoff from 10/28/10, 11/30/10 and 12/21/10
• Bilateral knee x-ray reports dated 12/21/10
• Attending Physician Statement from Dr. Yovanoff signed 01/07/11
• Telephone Conversation with Dr. Yovanoff from 01/18/11

Additionally, we have determined that you do not have a new Medical Condition as of 10/28/2010 as you had indicated and therefore this period of absence is a continuous absence and was already reviewed under your previous claim B085705482-0001-01.

(BPN 880).

### 5)    Plaintiff's LTD Claim

On or about April 26, 2011, Sedgwick received Plaintiff's claim for LTD benefits.  (BPN 314).  Sedgwick assigned claim number B085705482-0001-02 to this claim.  (Pl. SMF, ¶ 258). Sedgwick denied Plaintiff's claim the next day, and notified her by letter dated April 27, 2011, which states in relevant part:

> At this time, it has been determined that you do not qualify for disability benefits under the Plan. As a result, your claim for benefits is denied for the period beginning 8/2/10.
>
> According to the documentation we have gathered, your first day of absence was 8/2/2010 and your Short Term Disability claim was denied as of 8/2/10. You have not satisfied the waiting period as defined below.

(BPN 934-935). The letter defines the LTD Plan waiting period as the "180 calendar day period of time that starts on the first day as of which the Claims Administrator that you are disabled." (BPN 935).

### 6) Plaintiff's Administrative Appeals

On June 22, 2011, Plaintiff appealed Sedgwick's denial of both her STD claims and her LTD claim by sending a letter via her attorney to Sedgwick, which included certain additional medical records. (BPN 938-976). The letter described the basis for the appeal as follows:

> Ms. Delprado is diagnosed with fully disabling and debilitating fibromyalgia resulting in chronic and severe joint and muscle pain and stiffness particularly in her hands, knees, shoulders and hips, edema of both legs, and excessive thirst and fatigue. Ms. Delprado's repeatedly documented diagnosis is contrary to your company's conclusion to the contrary.

(BPN 938). Sedgwick notified Plaintiff that the she could not appeal the denial of her first STD claim because she had already "completed the allowable appeal under the terms of her Plan," which was decided on October 12, 2010. (BPN 1085).

### a. Medical Records Provided

In her appeal, Plaintiff argued that Sedgwick had failed to consider certain key medical records: (1) the September 13, 2010 office note from Dr. Dorsey, which stated that Plaintiff "has tender points. She seems to definitely has [sic] fibromyalgia" (BPN 774, 949); and (2) the January 20, 2010 office note from Dr. Huyck, which stated that Plaintiff "may well have predominantly a fibrositic syndrome." (BPN 608, 954). Plaintiff also referred Sedgwick to Dr.

Fishel's office notes from August 2010, wherein she had reported chronic pain and fatigue. (BPN 957-963).

Plaintiff included several medical records in the appeal that had not been previously submitted to Sedgwick. In an office note dated January 19, 2011, Dr. Dorsey noted that Plaintiff "continues to have tremendous pain in joints and muscles and overwhelming fatigue." (BPN 965-966). Dr. Dorsey also recorded that Plaintiff had "multiple tender points." (*Id.*). Dr. Dorsey's assessment was:

> Early rheumatoid arthritis
> Fibromyalgia
> DJD knees
> She is disabled

(*Id.*).

Plaintiff also submitted a February 3, 2011 report from Dr. Joseph Prezio, who conducted an independent medical examination of Plaintiff on behalf of the Social Security Administration. (BPN 968-971). In the Chief Complaint section of the report, Dr. Prezio wrote in relevant part:

> The claimant is a registered nurse who has not worked in six months because she was denied disability by her employer.
>
> She complains of joint pain and muscle pain throughout all of her muscle groups and joints attributable to fibromyalgia that has existed for at least the past two to three years, most exaggerated since 07/09. With that she has noted a trigger thumb on the left side and migratory joint pain on a level of 10/10 at its worst and 5/10 at its best. With that has been associated dependent edema of both legs with puffiness and weakness.

(BPN 969). Dr. Prezio noted the following in his physical exam of Plaintiff:

> MUSCULOSKELETAL: Cervical spine shows full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally. No scoliosis, kyphosis, or abnormality in thoracic spine. Lumbar spine shows flexion limited to 30 degrees, full extension, lateral flexion bilaterally, and full rotary movement bilaterally, SLR negative bilaterally. Full ROM of shoulders, elbows, forearms, and wrists bilaterally. Full ROM of hips, knees, and ankles bilaterally. With each maneuver there is increased pain and sensitivity noted in the muscle groups and in the joints.

> No evident subluxations, contractures, ankylosis, or thickening. Joints stable and
> nontender. No redness, heat, swelling, or effusion. Trigger points are evident
> globally throughout all the major muscle groups.

(BPN 970). Dr. Prezio's diagnosis for Plaintiff was: "1. Fibromyalgia. 2. Hypertension, by

history." (BPN 971). He concluded that "[t]he claimant has mild restriction for prolonged

standing, walking, squatting, kneeling, heavy lifting or bending because of the fibromyalgia

complaints present at this time." (*Id.*). Finally, the last two records included with Plaintiff's

appeal letter were an X-Ray report dated February 5, 2011 noting "soft tissue swelling

surrounding the wrist," (BPN 972), and a letter to Plaintiff from the Social Security

Administration dated February 18, 2011 awarding Plaintiff Social Security disability benefits

"beginning January 2011." (BPN 973-976).

### b.    Dr. Payne's Second Report

Sedgwick requested an additional peer review regarding Plaintiff's appeal of the second

STD claim, which was conducted once again by Dr. Payne and summarized in a report dated

August 3, 2011. (BPN 1030-1033). Dr. Payne did not examine Plaintiff, but based his report on

the medical records he received and a conversation with Dr. Yovanoff.[18] Dr. Payne summarized

his conversation with Dr. Yovanoff as follows:

> Dr. Yovanoff confirmed that he had seen no evidence of rheumatoid arthritis. He
> also mentioned to me that she had been on corticosteroids at the time of his initial
> evaluation, and he had discontinued these agents, yet no inflammatory features
> had arisen. He last saw Ms. Delprado in December 2010. He reported she had
> some degenerative disease in the knee and also some neck pain which he felt was
> related to degenerative disease. Her ESR was normal, and she had a negative anti-
> CCP antibody.

---

[18] The medical records provided for review consisted of X-Rays, lab results, and the following reports from
Plaintiff's doctors: Progress Notes: C.J. Huyck, M.D. dated 01/20/10; Progress Notes: S. Fishel, M.D. dated
08/03/10-08/27/10; Progress Notes: Saratoga Medical Associates dated 09/13/10-04/05/11 and Undated; Progress
Notes: J. Yovanoff, M.D. 10/28/10-01/04/11; and Progress Notes: J. Prezio, M.D. dated 02/03/11. (BPN 1030).

(*Id.*). Dr. Payne stated that he attempted to call Dr. Dorsey several times, but never received a

call back. (BPN 1031). Dr. Payne provided the following "Rheumatology Synopsis:"

> Christine Delprado is a female with a history of fibromyalgia that was initially diagnosed in the fall of 2009.[19] The data provided mention the development of muscle and joint pain that is diffuse and widespread. There is also reported stiffness and fatigue, with non-specific numbness and weakness described. There is no historical data documenting inflammatory features. There was an episode in July 2009 of some knee swelling which was felt to be possibly related to an infectious process. She was treated with amoxicillin and doxycycline, and the problem seemed to resolve with no further evidence or finding given in the records reviewed. No long-term sequelae are described. There was no mention of any cardiac, pulmonary, gastrointestinal, or neurological problems that would be restricting or limiting in the historical data.

> The work-up data report a positive rheumatoid factor, but a normal CRP. Her anti-CCP antibody was negative, and she had a normal ESR. She had a reported positive Lyme titer by ELISA, but all of the details of this finding are not provided. There is no imaging data, and there are no reports of any other laboratory testing provided.

> Examination findings in the medical record potentially note only the presence of diffuse tenderness. There is no mention of synovitis, weakness, or atrophy. There is no mention of any evidence of joint damage, deformity, or destruction. There is no mention noted of any cardiac, pulmonary, gastrointestinal, or neurological features that would be restricting or limiting.

> Treatment data document the corticosteroid trial. There is also mention of her being treated with Lyrica, hydrocodone, and antihypertensive agents. Other therapy includes treatment with antibiotics for possible Lyme disease.

(*Id.*). In response to the Examiner's first question, "Is the employee disabled from her regular

unrestricted job as of 10/28/10 through return to work?," Dr. Payne wrote:

> Based on the medical record data provided for review, the employee is not disabled from her regular unrestricted job from a rheumatology perspective as of 10/28/10 through return to work. There is no evidence in the provided medical information of restrictions or limitations from a rheumatology

---

[19] There is nothing in the record supporting Dr. Payne's statement that Plaintiff had a diagnosis of fibromyalgia dating back to the fall of 2009. While Plaintiff reportedly received treatment for Lyme disease in the fall of 2009 (BPN 633), the first mention of Plaintiff having fibromyalgia is from January 2010 when Dr. Huyck observed that Plaintiff "may well have predominantly a fibrositic syndrome." (BPN 608). Plaintiff did not receive a diagnosis of fibromyalgia until the fall of 2010, when Dr. Dorsey concluded on September 13, 2010 that "[s]he seems to definitely has [sic] fibromyalgia." (BPN 774).

viewpoint.

(*Id.*).  In response to the Examiner's third question, "What are the clinical findings contained in the medical record and how would these findings impact the employee's ability to function in her regular unrestricted occupation?," Dr. Payne stated:

> The clinical findings in this medical record are essentially limited to features of diffuse and widespread pain with no evidence of systemic inflammatory disease. There are also no physical findings reported that would support any impairment in functionality. She is not disabled from her regular unrestricted job from a rheumatology perspective as of 10/28/10 through return to work.

(BPN 1032).  Dr. Payne stated the following in the conclusion to his report:

> I have performed a complete and thorough review of the medical record data provided in this case. There is mention of diffuse and chronic pain, and the patient has been diagnosed with soft tissue rheumatism. There is no evidence found historically of inflammatory disease that is impacting functionality. The work-up data is unremarkable, other than the reported positive rheumatoid factor, but there are no clinical features supporting rheumatoid arthritis. The examination features are remarkable only for reports of tender points, with no evidence of synovitis, weakness, or atrophy. There are no findings that support any impairment in functionality. Based on the available data, there is no evidence of any rheumatological process or syndrome that is producing impairment in function as of 10/28/10 through return to work.

(*Id.*).

On August 29, 2011, Sedgwick recorded the following entry in its claim notes regarding Plaintiff's second STD claim:

> The period from 10/28/10 forward was reviewed. This claim was opened administratively under the premise that [employee] had a new [diagnosis] of fibromyalgia. However, upon disability investigation, it was concluded that this was not a new [diagnosis] and would therefore fall under the absence of [employee]'s previous claim, with [first date of absence] 8/2/10. As such, it was denied due to [employee] not being eligible for a new period of review as [employee] did not [return to work] between claims and there was no new condition to review.
>
> Appeals investigation has concluded that the diagnosis of fibromyalgia is not a new diagnosis as [employee] claimed and therefore, the denial for this period beginning 10/28/10 would be upheld as [employee] did not [return to work]

between claims to satisfy a relapse provision and did not have a new diagnosis preventing her from [return to work] for this absence. Thus, the denial would fall under the original claim denial, which was on 8/27/10. Appeals referred to IPA for review of medical to determine if [diagnosis] of fibromyalgia is recent and Rheum IPA concluded that fibro [diagnosis] was established in 2009.

(BPN 351). On September 6, 2011, Sedgwick further noted:

> Recommendation to uphold decision for denial of STD benefits from 10/28/10 – [return to work] as [employee] is not eligible for benefits as [employee] does not have a new medical condition as of 10/28/10[.]

> [Employee]'s file was referred to D. Dennis Payne, Jr., M.D., a board-certified specialist in Rheumatology, for review.

> Dr. Payne concluded that Ms. Delprado has a history of fibromyalgia that was initially diagnosed in the fall of 2009. In the medical records provided there is mention of diffuse and chronic pain, and Ms. Delprado has been diagnosed with soft tissue rheumatism. The data provided mention the development of muscle and joint pain that is diffuse and widespread.

> Therefore, Ms. Delprado absence is a continuous absence of her previous claim B085705482-0001-01 that was already reviewed.

(BPN 350-351).

### c.    Denial of Appeals

The Administrative Record indicates that an employee from Sedgwick telephoned Plaintiff's counsel on September 20, 2011 and left a message that Plaintiff's second STD claim appeal had been denied on the basis that Plaintiff did not have a new condition. (BPN 348-349). Plaintiff's counsel denies receiving any such message. (Pl. SMF Response, ¶ 145). It is undisputed that Sedgwick failed to issue a formal letter regarding its appeal decision on Plaintiff's second STD claim. (Defs. SMF, ¶ 162; Pl. SMF Response, ¶ 162; Defs. Reply, p. 9).

On September 20, 2011, Sedgwick informed Plaintiff through her attorney that her appeal for LTD benefits had been denied. (BPN 1111-1113). The letter states that Plaintiff "was not disabled in excess of the [180 day] waiting period" required by the LTD Plan. (BPN 1111).

### d. Plaintiff's Second Level Appeals

In December 2011, Plaintiff requested second level appeals of all three denied claims. (BPN 1120, 1143-1144). The second level appeals were referred to the UHG Disability Appeals Committee, which conducted a closed file review, wherein "only documents received during the initial claim review and first appeal review [were] considered." (BPN 1132, 1154).

UHG employee Becka Erickson summarized Plaintiff's appeals in the following internal email, dated February 16, 2012:

> STD claim B085705482-0001-01 - Not eligible for 2nd level appeal because the initial denial was in 2010 when we didn't have the 2nd level appeal process
>
> LTD claim B085705482-0001-01 - The attorney's letter did not specifically state he was filing a 2nd level appeal for this case as it stated he wanted this claim approved automatically based on not receiving the denial letter from appeals. He asserted his intent to have a 2nd level appeal for this case considered in his response to your letter in the last week. Therefore, we reviewed the case and determined there was nothing to support overturning the initial denial.
>
> STD claim 30101206852-0001 - The denial of this claim did come initially in 2011 so we are able to consider this for 2nd level appeal. There are a couple of issues, however. First, the claim was denied by the claim team because medical did not substantiate disability. On appeal, however, it was determined that the employee did not file this claim for a new condition so the previous denial was upheld although it was for a different reason than the initial denial. Without any new information to consider, we would uphold the previous denial decisions but we aren't clear if the appeal was because this employee feels this is a distinct condition/diagnosis that merited a new claim or if the employee feels that her disability was supported. Perhaps she feels both but I want to be clear that we only evaluated to say that nothing submitted clarified this and we did not feel that anything on the case merited overturning the previous decisions so the denial, for whatever reason, is upheld.
>
> If the attorney was claiming additional time to provide information on any of these cases, please advise. With 3 cases in the mix, I'm not entirely sure I know the exact status of all 3 of these appeals so please confirm before sending out the letters.

(BPN 1175). On February 20, 2012, Sedgwick sent Plaintiff's counsel a letter rejecting her second level appeal on the second STD benefits claim, stating in relevant part:

> The UHG Appeals Committee has completed a thorough review of your request for 2nd level appeal of Ms. Delprado's Short Term Disability claim. Information reviewed includes all claim notes; all claim documents and the applicable Summary Plan Document (SPD). The UHG Appeals Committee has concluded that the SPD and the STD claim process were followed and that there is no basis to overturn the previous decisions.

(BPN 1165). On the same date, Sedgwick sent Plaintiff's counsel a letter rejecting her second level appeal for LTD benefits, stating in relevant part:

> The UHG Appeals Committee has completed a thorough review of your request for 2nd level appeal of Ms. Delprado's Long Term Disability claim. Information reviewed includes all claim notes; all claim documents and the applicable Summary Plan Document (SPD). The UHG Appeals Committee has concluded that the SPD and the LTD claim process were followed and that there is no basis to overturn the previous decisions.

(BPN 1164). On March 13, 2012, Plaintiff commenced this action seeking judicial review of the decisions by Sedgwick and UHG to deny her claims for STD and LTD benefits. (Dkt. No. 1-2).

## II. APPLICABLE LEGAL STANDARDS

### A. Summary Judgment

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a

showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322; *see also Selevan v. N.Y. Thruway Auth.,* 711 F.3d 253, 256 (2d Cir. 2013).

If the moving party meets this burden, the nonmoving party must "set forth specific facts showing a genuine issue for trial." *Anderson,* 477 U.S. at 248; *see also Celotex,* 477 U.S. at 323-24. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 12 (2d Cir.1986) (quoting *Quarles v. Gen. Motors Corp.,* 758 F.2d 839, 840 (2d Cir. 1985)). Furthermore, "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines,* 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.,* 68 F.3d 1451, 1456 (2d Cir.1995) (internal quotation marks and citations omitted)). When ruling on a summary judgment motion, "the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.,* 352 F.3d 775, 780 (2d Cir. 2003).

## B.     ERISA

"ERISA was enacted to promote the interests of employees and their beneficiaries in employee benefit plans, and to protect contractually defined benefits." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 113 (1989). Plans must "provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the

participant." 29 U.S.C. § 1133(1). Further, the Plan procedures must "afford a reasonable opportunity for a full and fair review" of adverse claim determinations. 29 U.S.C. § 1133(2). Full and fair review "requires that administrators follow proper procedural protocols in how they review claims, how much weight they assign different types of records, and how they reach decisions." *Martucci v. Hartford Life Ins. Co.*, 863 F. Supp. 2d 269, 274 (S.D.N.Y. 2012) (citing *Hobson v. Metro. Life Ins. Co.*, 574 F.3d 75, 86-87 (2d. Cir. 2009)). ERISA also provides a Plan beneficiary with a right to judicial review of a benefits termination. 29 U.S.C. § 1132(a)(1)(B). A claimant bears the burden of proving that she is eligible for disability benefits. *Miles v. Principal Life Ins. Co.*, 720 F.3d 472, 488 (2d Cir. 2013) (citing *Mario v. P & C Food Mkts., Inc.*, 313 F.3d 758, 765 (2d Cir. 2002)).

### C.      Standard of Review

"ERISA does not set out the appropriate standard of review for actions under §1132(a)(1)(B) challenging benefit eligibility determinations." *Firestone Tire & Rubber Co.*, 489 U.S. at 109. Rather, the Supreme Court has held that a Plan Administrator's decision to deny benefits is reviewed *de novo*, unless the Plan gives the "administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.*, at 115. When the Plan gives the administrator discretionary authority, judicial review of the adequacy of a claim decision is limited to determining whether the decision was "arbitrary and capricious" or "an abuse of discretion." *Id.*

Here, the Plan expressly provides for discretionary authority: the Administrator "has the sole and exclusive authority and discretion to interpret the benefit plans' terms and benefits under them, and to make factual and legal decisions about them." (BPN 8, 128). However, Plaintiff argues that *de novo* review should apply because of: 1) an alleged conflict of interest

33

between the Administrator and Payor of benefits; and 2) alleged procedural errors in the benefits decision and appeal process.  (Pl. Br., pp. 20-21).

### 1) Conflict of Interest

Plaintiff argues that "[a]n inherent conflict of interest exists between the Defendants since Sedgwick and UHC were both owned either wholly or in part by UHG and UHG self-funded the STD and first 24 months of benefits of the LTD Plans. Thus, monetary savings on denied disability claims financially benefited all."  (Pl. Br., p. 20).

A structural conflict of interest exists where the evaluator and payor of benefit claims is the same party.  In order to trigger *de novo* review of an administrator's discretionary decision, however, a Plaintiff alleging a conflict of interest "must show that the administrator was *in fact* influenced by the conflict of interest."  *Pulvers v. First UNUM Life Ins. Co.*, 210 F.3d 89, 92 (2d Cir. 2000) (citing *Sullivan v. LTV Aero. & Defense Co.*, 82 F.3d 1251 (2d Cir. 1996)); *see also Jennison v. Hartford Life & Accident Ins. Co.*, No. 10 Civ. 164, 2011 U.S. Dist. LEXIS 85623, at *20, 2011 WL 3352449, at *7 (N.D.N.Y. Aug. 3, 2011) ("[U]nless there is evidence that the decision was influenced by the conflict of interest, the standard of review remains arbitrary and capricious review.").

Here, Plaintiff argues that Sedgwick had an inherent conflict in evaluating her claims because Sedgwick was in part owned by UHG, the payor of those claims.  (Pl. Br., p. 20).  The record shows that in 2008, UHG "purchased a minority interest in Fidelity Sedgwick Holdings, Inc., the parent company of Sedgwick CMS."  (Dkt. No. 98-5, p. 99).  Plaintiff asserts that UHG exercised some control over Sedgwick's administrative decisions because "the STD and LTD Plan's second level appeals are determined by a three member UHG Appeal Committee comprised solely of UHG employees."  (Pl. Br., p. 20).  Defendants argue that there is no

conflict of interest because Sedgwick is a "third-party administrator that is not responsible for payment of the benefit claims it administers." (Defs. Reply, p. 22).

While Plaintiff has made a superficial case for at least a minor conflict of interest, she has not adduced any evidence to show that Sedgwick was in fact influenced by the conflict. Accordingly, the Court will not apply *de novo* review on this basis. *See Rivera v. Hartford Fire Ins. Co.*, 52 Fed. App'x. 551, 552 (2d Cir. 2002) (finding that District Court correctly declined to apply *de novo* review where Plaintiff "provided nothing more than conjecture and speculation" to support her allegation of conflict).[20]

### 2) Procedural Errors

Plaintiff further argues that *de novo* review should apply based on several alleged procedural errors in Sedgwick's decision-making process: 1) Sedgwick issued an untimely decision on Plaintiff's first STD claim; 2) Sedgwick issued an untimely decision on Plaintiff's LTD claim; and 3) Sedgwick failed to issue a written denial letter regarding Plaintiff's first appeal of her second STD claim. (Pl. Br., pp. 19-20).

For Plaintiff's first STD claim, the record demonstrates that the letter denying her appeal was mailed on October 13, 2010 and received by Plaintiff on October 19, 2010. (BPN 322, 702). The Plan required Sedgwick to "notify" Plaintiff of its STD decision within forty-five days after receipt of her appeal. (Dkt. No. 90-2, p. 38). Since Plaintiff filed the appeal on August 29, 2010, Sedgwick had until October 13, 2010 to notify Plaintiff. Therefore, Sedgwick arguably complied with the forty-five day notification requirement, and at worst, was six days late.

---

[20] The Court will still consider the conflict in reviewing the decisions to deny Plaintiff disability benefits. *See Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008) (holding that "reviewing court should consider [conflict of interest] as a factor in determining whether the plan administrator has abused its discretion in denying benefits; and that the significance of the factor will depend upon the circumstances of the particular case").

As to Sedgwick's decision on Plaintiff's LTD appeal, the record shows that on August 5, 2011, forty-five days after Plaintiff appealed, Sedgwick notified her counsel by letter that a forty-five day extension was necessary to make a decision, as permitted by the Plan. (BPN 1098). On September 20, 2011, forty-five days later, Sedgwick denied Plaintiff's appeal. (BPN 1111-1113).[21] Plaintiff appealed again on December 15, 2011, and the Plan required the UHG Disability Appeals Committee to make a determination with sixty days (BPN 234), by February 13, 2012. The record indicates that a denial letter was sent seven days late on February 20, 2012. (BPN 1164).

For Plaintiff's second STD claim, it is undisputed that Sedgwick failed to issue a written denial letter regarding her first appeal. (Defs. SMF, ¶ 162; Pl. SMF Response ¶ 162; Defs. Reply, p. 9). Plaintiff argues that *de novo* review should apply where the "administrator vested with discretion does not exercise that discretion and fails to issue a decision." (Pl. Br., p. 16) (citing *Nichols v. Prudential Ins. Co. of America,* 406 F.3d 98, 109 (2d Cir. 2005)). Defendants argue that the oversight stemmed from tangled communications with Plaintiff's counsel, and moreover, that the error did not prejudice Plaintiff because she still received effective notice. (Defs. Reply, pp. 14-15).

Sedgwick's failure to issue a written determination letter is a significant procedural error. Under ERISA, Sedgwick must provide written notice setting forth the specific reasons for a denied claim. *See* 29 U.S.C. § 1133(1). A brief voicemail message, assuming it was received,[22] is hardly an adequate substitute. However, any lack of notice was not overly prejudicial since Plaintiff promptly sought a second level appeal, the parties remained in regular communication,

_____

[21] While it appears the September 20, 2011 letter bore the wrong claim number, there is no dispute that the message of the letter was to deny Plaintiff's LTD appeal.

[22] As described above, Sedgwick asserts that it informed Plaintiff of the denial by leaving a voicemail message for Plaintiff's counsel, and Plaintiff's counsel denies having received any such message. (Pl. SMF Response, ¶ 145).

and a final written decision was ultimately issued.  Since the second level appeal was closed file—based only on documents receiving during the initial claim review and first appeal—Plaintiff was also not deprived of the opportunity to provide further information.  (BPN 234).

Although it is a close question, the Court finds that Plaintiff has not shown sufficient grounds for *de novo* review.  Given the lack of demonstrated prejudice from Sedgwick's failure to issue a formal determination letter, and at most, two minor departures from Plan deadlines, Sedgwick's decisions are entitled to *Firestone* deference.  Despite several errors, Sedgwick still substantially complied with the Plan by exercising its discretion and making decisions at every stage of Plaintiff's claims.  Thus, Plaintiff's reliance on *Nichols v. Prudential Ins. Co.*, 406 F.3d 98 (2d Cir. 2005) is misplaced.  There, the Plan Administrator failed to exercise its discretion and make a decision.  As a result, there could be no review for abuse of discretion and *de novo* review was necessary.  *Id*. at 109.  Courts have generally limited *Nichols'* application to those cases in which an administrator fails entirely to issue a decision.  *See Wedge v. Shawmut Design & Constr. Group Long Term Disability Ins. Plan*, No. 12 Civ. 5645, 2013 U.S. Dist. LEXIS 129119, at *24, 2013 WL 4860157, at *10 (S.D.N.Y. Sept. 10, 2013) ("It would turn *Firestone* on its head to conclude that any transgression – however minor or technical, and for whatever reason (including claimant-generated) – from ERISA's requirements resulted in wholesale forfeiture of a plan administrator's discretion."); *see also Topalian v. Hartford Life Ins. Co.*, 945 F. Supp. 2d 294, 337 (E.D.N.Y. 2013) ("[T]he weight of authority in the Second Circuit supports the application of arbitrary and capricious review where . . . the plan administrator remains in regular contact with the benefits claimant and issues a decision prior to the commencement of federal litigation.").

Accordingly, the Court reviews the decisions by Sedgwick and UHG to deny Plaintiff's claims for STD and LTD benefits under the arbitrary and capricious standard.

### 3) The Arbitrary and Capricious Standard of Review

Under this standard of review, an administrator's decision should only be disturbed if it is "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Celardo v. GNY Auto. Dealers Health & Welfare Trust*, 318 F.3d 142, 146 (2d Cir. 2003) (citing *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 442 (2d Cir. 1995)). In reviewing the administrator's decision deferentially, a district court must consider "whether the decision was based on a consideration of the relevant factors." *Miller v. United Welfare Fund*, 72 F.3d 1066, 1072 (2d Cir. 1995). Substantial evidence for the administrator's decision consists of "such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [administrator and] . . . requires more than a scintilla but less than a preponderance." *Celardo*, 318 F.3d at 146 (citing *Miller*, 72 F.3d at 1072). The Plaintiff bears the burden of demonstrating that the denial of benefits was arbitrary and capricious. *See Sharkey v. Ultramar Energy Ltd.*, 70 F.3d 226, 230 (2d Cir. 1995). "As applied to a motion for summary judgment, 'the arbitrary and capricious standard requires that [the Court] ask whether the aggregate evidence, viewed in the light most favorable to the non-moving party, could support a rational determination that the plan administrator acted arbitrarily in denying the claim for benefits.'" *Wedge v. Shawmut Design & Constr. Group Long Term Disability Ins. Plan*, 23 F. Supp. 3d 320, 333-334 (S.D.N.Y. 2014) (quoting *Davis v. Commercial Bank*, 275 F. Supp. 2d 418, 425 (S.D.N.Y. 2003)).

### D. Scope of Review

### 1) Evidence Outside the Administrative Record

The Court's review under the arbitrary and capricious standard is ordinarily limited to the

Administrative Record.  *Miller*, 72 F.3d at 1071; *Zervos v. Verizon N.Y., Inc.*, 277 F.3d 635, 646 (2d Cir. 2002).  However, the Court may within its discretion admit evidence outside the Administrative Record provided there is a showing of good cause.  *See Krauss v. Oxford Health Plans, Inc.*, 517 F.3d 614, 631 (2d Cir. 2008); *Juliano v. Health Maint. Org. of N.J., Inc.*, 221 F.3d 279, 289 (2d Cir. 2000).  Plaintiff argues that there is good cause for admitting evidence outside the Administrative Record for several reasons: 1) the alleged conflict of interest; 2) the alleged procedural errors in the claims determination process; and 3) the alleged incompleteness of the Administrative Record.  (Pl. Br., pp. 17-18).  While the first two reasons may support a finding of good cause, *see Locher v. UNUM Life Ins. Co. of Am.*, 389 F.3d 288, 295 (2d Cir. 2004), the Court finds them insufficient in this case, for the reasons discussed *supra* in Part II(C).

Plaintiff alleges that the Administrative Record is incomplete because it is missing certain key documents including:

> Postmarked envelopes in which Defendants, particularly Sedgwick, mailed denials and notices that demonstrate the mailings of these sometimes occurred many days after the letters are dated; medical information and documents that were provided to Defendants, particularly Sedgwick.

(Pl. Br., p. 18).  An incomplete Administrative Record may constitute good cause for admitting additional evidence.  *Zervos*, 277 F.3d at 646-647; *Paese v. Hartford Life & Accident Ins. Co.*, 449 F.3d 435, 441 (2d Cir. 2006).  However, the Court need not consider additional evidence "where a party fails to demonstrate, beyond mere speculation or conjecture, that the 'administrative record is inadequate to conduct a proper review of the administrative decision.'" *Hotaling v. Teachers Ins. & Annuity Ass'n of Am.*, 62 F. Supp. 2d 731, 738 (N.D.N.Y. 1999) (quoting *DeFelice v. Am. Int'l Life Assur. Co. of New York*, 112 F.3d 61, 65 (2d Cir. 1997)).

Plaintiff has submitted a number of documents which she alleges should have been included in the Administrative Record or should be used to supplement it.  (*See* Dkt. No. 98-5).

However, the Court finds there is not good cause to consider any of these documents. First, the depositions of Plaintiff's doctors are outside the record that would have been available to Sedgwick or UHG, and therefore, have no bearing on the reasonableness of their decisions.[23] *See Paese*, 449 F.3d at 441. Second, the Court has already discussed the relevant record with regard to correspondence and the timeliness of decisions *supra* in Part II(C)(2). Defendants have also identified several documents alleged to be missing that are in the Administrative Record. (*See* Defs. Reply, pp. 21-24).

As to additional medical records allegedly sent to Defendants, the Court will not consider these records because there is no evidence that they were made available to Sedgwick or UHS. Plaintiff has submitted two records from Dr. Yovanoff that are not contained in the Administrative Record: an Attending Physician Statement prepared for and sent to Hartford Life Insurance Company on November 4, 2010, and an office note prepared and sent to Hartford on November 15, 2010. (Dkt. No. 98-5, pp. 73, 75). But Plaintiff has adduced no evidence that either document sent to Hartford was also sent to Defendants, and thus these documents have no bearing on the reasonableness of Defendants' decisions. Moreover, the Administrative Record contains several documents regarding Dr. Yovanoff's medical opinions that obviate the need for and probative value of the records sent to Hartford: 1) an APS dated January 7, 2011 (BPN 830-833); 2) an office note dated November 30, 2010 (BPN 838-839); and 3) an office note dated October 28, 2010 (BPN 840-842). Therefore, Plaintiff has not demonstrated that the Administrative Record is inadequate to conduct a proper review of Defendants' decisions. *See Hotaling*, 62 F. Supp. 2d at 738. Accordingly, the Court will not consider the medical records sent by Dr. Yovanoff to Hartford, or any other documents outside the Administrative Record.

---

[23] For the same reasons, the Court cannot consider Plaintiff's after-the-fact affidavit submitted in support of her motion. (Dkt. No. 98-5).

### 2) Claim Notes

In responding to Defendants' Statement of Undisputed Material Facts, Plaintiff repeatedly objects that the Claim Notes in the Administrative Record are not admissible as evidence of any statement or action made by Sedgwick employees in the claim determination process because those employees have not personally attested to the contents of the Claim Notes. (*See, e.g.*, Pl. SMF Response, ¶ 38). As an initial matter, Plaintiff relies on the Claim Notes in her own motion. (*See, e.g.*, Pl. Br., p 34 (citing BPN 252)). Moreover, there is no dispute that the Claim Notes are part of the Administrative Record, and thus are properly before the Court. *Miller*, 72 F.3d at 1071; *see also King v. CIGNA Corp.*, No. 06 Civ. 6203, 2008 U.S. Dist. LEXIS 22992, at *13, 2008 WL 795823, at *5 (W.D.N.Y. Mar. 24, 2008) ("[T]he court is charged with reviewing the record before the plan administrator…not to determine whether or not the evidence before the administrator would or would not be admissible at trial.").

### E. Plaintiff's Motion to Strike

### 1) Brandhorst Affidavit

Before reviewing Defendants' decisions to deny Plaintiff disability benefits, the Court must decide Plaintiff's motion to strike. First, Plaintiff argues that the Affidavit of Sedgwick employee Jessica Brandhorst should be stricken in its entirety because it was untimely, and Ms. Brandhorst "does not attest to personal knowledge or how she gained knowledge of facts arising prior to July 2012" since she began employment at that time. (Pl. Br., pp. 13-14). As a general rule, the Court will not consider motion papers that are untimely unless good cause is shown. L.R. 7.1(b)(3). Here, Defendants filed the Brandhorst Affidavit two days after the June 30, 2014 deadline for summary judgment briefing. (Dkt. No. 94). Defendants attribute the delay to an additional review of the document by Sedgwick's internal legal office. (Defs. Reply, p. 6).

Given the minor delay, the timely filing of the vast majority of Defendants' motion papers, and the lack of prejudice demonstrated by Plaintiff, the Court finds that there is good cause to consider the Brandhorst Affidavit. *See LaVigna v. State Farm Mutual Auto. Ins. Co.*, 736 F. Supp. 2d 504, 510 (N.D.N.Y. 2010) (considering reply memorandum law filed one day late under similar circumstances).

Contrary to Plaintiff's argument that Ms. Brandhorst lacks personal knowledge, her affidavit states that: "Through my duties in my current and prior positions with Sedgwick, I have become knowledgeable regarding Sedgwick's claim administration procedures, its electronic systems, as well as the manner in which administrative records are created and maintained before and after litigation." (Dkt. No. 94, ¶ 3). Thus, even if she was not employed at Sedgwick before 2012, Ms. Brandhorst has sufficient personal knowledge from her professional experience to attest to aspects of Sedgwick's claim administration process and electronics systems, and how Plaintiff's claims were stored and retrieved from those systems. Accordingly, Plaintiff's motion to strike is denied.

### 2) **Anthony Affirmation**

Second, Plaintiff argues that portions of the Affirmation of defense counsel William J. Anthony should be stricken along with certain exhibits appended thereto (Dkt. Nos. 89-3 to 83-26), for the reason that Mr. Anthony "does not affirm to personal knowledge, and does not offer how he obtained knowledge or came into possession of the documents he attaches as exhibits to his affirmation." (Pl. Br., pp. 14-15). As this Affirmation and the exhibits annexed thereto relate only to Plaintiff's dismissed employment claims against UHS, Plaintiff's motion to strike is denied as moot.

## III.    ANALYSIS

### A.    Plaintiff's First STD Claim

Upon reviewing the Administrative Record, the Court finds that Sedgwick's decision to
deny Plaintiff's first STD claim, while initially arbitrary and capricious, was ultimately
reasonable on appeal given the lack of evidence showing that Plaintiff had a clear diagnosis to
explain her subjective symptoms.

#### 1)    Sedgwick's Initial Determination Was Arbitrary and Capricious.

When Plaintiff filed her claim on August 11, 2010, Sedgwick rushed to make a decision,
before receiving relevant evidence.  Sedgwick informed Plaintiff that it required supporting
medical records, requested an APS and office notes from her doctor's office, and specified that
these documents were due August 25, 2010.  (BPN 561, 566-567).  Sedgwick received the APS
from Dr. Fishel on August 23, 2010, but no medical records.  The APS stated that Plaintiff had
diagnoses of "osteoarthritis, fatigue, arthralgias" and co-morbids of "migraine, depression, HTN,
high cholesterol, lymes disease," with supporting findings of subjective complaints of fatigue
and joint pain and objective results showing osteoarthritis on X-rays and positive rheumatoid
factor on lab testing.   (BPN 596-597).  Dr. Fishel stated that Plaintiff was unable to perform her
current job because she had functional impairments due to fatigue and diffuse joint pain
exacerbated by moving.  (BPN 597).  Dr. Fishel also identified three previous visits when
Plaintiff had been treated at his office and stated that Plaintiff had been referred to a
Rheumatologist, Dr. Huyck.  (BPN 598).

On August 25, 2010, Sedgwick recorded the APS information, and then called Dr. Fishel
and Dr. Huyck, leaving voicemail messages to call back or to fax treatment notes relating to
Plaintiff immediately, since the "MDD is 8/25."  (BPN 338).  On August 27, 2010, without

hearing from or receiving notes from either doctor, Sedgwick denied Plaintiff's claim, stating

that the "medical information submitted does not demonstrate that you are unable to perform the

material duties of your own occupation and/or that you are under the regular and appropriate care

of a physician as required." (BPN 590). The only medical information Sedgwick cited in

denying the claim was Dr. Fishel's APS from August 23, 2010. (*Id*.).

Under the Plan, Sedgwick had forty-five days to decide Plaintiff's disability claim, with

the option to extend the review period for an additional forty-five days if Plaintiff failed to

submit necessary information. (BPN 114-115). When Plaintiff filed her claim on August 11,

2010, Sedgwick set August 25, 2010 as the deadline for the submission of Plaintiff's medical

information. Then Sedgwick decided the claim on August 27, 2010, a mere sixteen days after

Plaintiff filed the claim, and before the expiration of the forty-five-day review period, despite

recognizing, as demonstrated by its own requests, that it lacked necessary medical records from

Dr. Fishel and Dr. Huyck. Thus, this decision was not supported by substantial evidence and

constitutes an abuse of discretion.

Defendants do not address the propriety of the initial determination, instead arguing that

Sedgwick's decision on Plaintiff's appeal, which ultimately denied her application for benefits,

was reasonable based on the Administrative Record as a whole. (Defs. Br., p. 23). However, the

Court considers initial determinations *and* appeal decisions under the arbitrary and capricious

standard. *See Miles*, 720 F.3d at 487 (considering the administrator's initial and final decisions).

### 2)      Sedgwick's Appeal Decision Was Reasonable.

After Plaintiff appealed the initial determination, Sedgwick received medical records

from Dr. Fishel and Dr. Huyck, both of whom expressed uncertainty in diagnosing the cause of

Plaintiff's complaints of pain and fatigue. On August 3, 2010, Dr. Fishel examined Plaintiff and

noted "[s]he has a longstanding history of chronic pain, mostly neck and in legs…Patient is not sure whether she has been given a formal rheumatologic diagnosis."  (BPN 633).  Dr. Fishel observed "Not clear whether she has a true connective tissue disorder or just osteoarthritis that's worsening," and his generic assessment was "719.49 Pain Joint Multiple Sites."  (BPN 634).  On August 6, 2010, he repeated the same assessment and observed that he did not think Plaintiff was "typical for fibromyalgia."  (BPN 631).  On August 27, 2010, Dr. Fishel again assessed that Plaintiff had joint pain and observed she "[c]ontinues with diffuse arthralgias and fatigue, **etiology uncertain**."  (BP 630) (emphasis added).  In a separate APS for Hartford Life Insurance Company, submitted to Sedgwick on September 21, 2010, Dr. Fishel described Plaintiff's symptoms as fatigue and joint pain and diagnosed arthritis and fatigue.  (BPN 674.)

Dr. Huyck expressed similar uncertainty in his notes.  On January 20, 2010, his impression was "[d]iffuse and somatic pain with mild defuse underlying osteoarthritis and spondylosis. The patient may well have predominantly a fibrositic syndrome."  (BPN 608).  On February 2, 2010, Dr. Huyck's impression was "[g]eneralized osteoarthritis, rule out possibly early inflammatory arthritis."  (BPN 612).  On April 1, 2010, Dr. Huyck noted "partial improvement in her generalized discomfort" due to medication and continued weakness," with an impression of "[h]istory of positive ANA and poly arthralgias."  (BPN 613-614).

The picture that emerges from the medical records at this juncture is one of doctors struggling to identify the medical condition responsible for Plaintiff's subjective complaints of pain and fatigue.  Sedgwick again asked Dr. Payne for an independent report.  (BPN 651-655).  Dr. Payne reviewed Plaintiff's records from Dr. Huyck and Dr. Fishel,[24] noted the various

---

[24] Although there is no indication that Dr. Payne reviewed Dr. Fishel's May 20, 2010 and July 19, 2010 notes, these notes are consistent with the August 2010 notes, which Dr. Payne reviewed, in describing Plaintiff's complaint of chronic pain.  Therefore, there is no basis on which to find that Dr. Payne's failure to review the May and July notes affected his opinion.  (*See* BPN 657-662).

diagnoses of "osteoarthritis, depression, hypertension, and elevated cholesterol," and scrutinized the exam findings. (BPN 654). Dr. Payne concluded that Plaintiff's exam findings were "essentially remarkable only for the presence of mild osteoarthritis. None of the findings would be restricting or limiting." (*Id.*).

With no clear diagnosis from Plaintiff's doctors to explain her subjective complaints, Sedgwick reasonably relied on Dr. Payne's report and opinion that Plaintiff was not disabled. *See Hobson v. Metro. Life Ins. Co.*, 574 F.3d 75, 88 (2d Cir. 2009) (The Administrator is "not required to accord the opinions of a claimant's treating physicians 'special weight,' especially in light of contrary independent physician reports.") (citing *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003)); *see also Tortora v. SBC Commc'ns, Inc.*, 739 F. Supp. 2d 427, 446 (S.D.N.Y. 2010). In the denial letter, Sedgwick repeated Dr. Payne's conclusion that, "the medical information submitted does not demonstrate that [she] was unable to perform the material duties of [her] own occupation." (BPN 691-692). Given the absence of clear documentation of functional impairments and limitations due to a Medically Determinable Impairment, Sedgwick's denial of Plaintiff's first claim for STD benefits was not arbitrary and capricious.[25]

### B. Plaintiff's Second STD Claim

Sedgwick's denial of Plaintiff's second STD claim, however, was arbitrary and capricious because it was not supported by substantial evidence: defendants failed to consider the opinions of Plaintiff's doctors, failed to consider Plaintiff's subjective complaints of disabling pain, and failed to provide adequate notice of information needed for Plaintiff's claim.

#### 1)    Diagnosis of Fibromyalgia

---

[25] Plaintiff was not entitled to a second level appeal of this claim because the option did not exist under the March 2010 version of the Plan. (BPN 116). The January 2011 version of the Plan added a second level of appeal, but Plaintiff's appeal was denied before it went into effect, and therefore, Plaintiff was not eligible. (BPN 233, 1175).

Plaintiff first received a tentative diagnosis of fibromyalgia on September 13, 2010, when Dr. Dorsey examined her and concluded "[s]he seems to definitely has [sic] fibromyalgia." (BPN 608, 774).[26] After Plaintiff's first claim for STD benefits was denied, she applied again, noting that she had been diagnosed with fibromyalgia.[27] (BPN 405).

### 2) The Initial Denial of Plaintiff's Second STD Claim Was Arbitrary and Capricious.

In its January 20, 2011 letter, Sedgwick stated two reasons for denying Plaintiff's second STD claim: 1) the "medical information submitted does not demonstrate that you are unable to perform the material duties of your own occupation," and 2) "you do not have a new Medical Condition as of 10/28/2010 as you had indicated." (BPN 880). As to the first reason, Sedgwick's claim notes reflect the internal view that Plaintiff failed to submit evidence of a valid fibromyalgia diagnosis, and therefore, her "medical [information] did not substantiate disability." (BPN 1175; *see also* BPN 380 ("[There is no support for that [fibromyalgia] diagnosis…the medical records continue to substantiate no functional deficit.")). However, Sedgwick's review of Plaintiff's records included only an APS and office notes from Dr. Yovanoff, an X-Ray report, and a telephone conversation with Dr. Yovannoff. (*Id.*). There is nothing in the record indicating that Sedgwick considered the APS and office notes from Dr. Dorsey, which contained a fibromyalgia diagnosis.

Sedgwick received an APS from Dr. Dorsey on January 7, 2011 listing one diagnosis for Plaintiff: fibromyalgia. (BPN 818). Dr. Dorsey stated that Plaintiff complained of pain and fatigue, and in the "Objective" supportive findings section, stated: "Tender points." (BPN 819).

---

[26] Dr. Huyck's January 20, 2010 note that Plaintiff "may well have predominantly a fibrositic syndrome" merely raises the possibility of fibromyalgia diagnosis. (BPN 608).

[27] Plaintiff appeared to believe that Dr. Yovanoff had made a diagnosis of fibromyalgia during his initial consultation on October 28, 2010. (*See* Defs. SMF, p. 27 at ¶¶ 77, 94). However, Dr. Yovanoff had not provided a diagnosis for her symptoms at that time. (BPN 853).

Dr. Dorsey concluded that Plaintiff could not work because of severe pain and fatigue and stated that she "must avoid lifting, bending, sitting, walking." (*Id.*). Sedgwick also had Dr. Dorsey's office note from September 13, 2010 stating that Plaintiff had pain and fatigue, and moreover, "she has tender points. She seems to definitely has [sic] fibromyalgia." (BPN 774). Thus, Sedgwick was aware that Plaintiff had a fibromyalgia diagnosis, and exam findings of tender points—which were specifically cited by Sedgwick in the claim notes as one of the criteria for diagnosing fibromyalgia.[28]

Nothing in the Administrative Record suggests that Sedgwick considered Dr. Dorsey's APS or notes; it instead focused entirely on Dr. Yovanoff's failure to diagnose fibromyalgia. On January 14, 2011, the NCM reviewed Dr. Yovanoff's medical records and noted "the diagnosis of fibromyalgia is never once mentioned," and therefore, "there is no support for that diagnosis." (BPN 379-380). The NCM asked Dr. Yovanoff if he had diagnosed Plaintiff with fibromyalgia, and he stated no, "[t]he diagnosis is chronic fascial pain syndrome." (BPN 373). The NCM did not mention Dr. Dorsey's APS and notes in her review, and there is no indication that she made any attempt to speak with her on the telephone regarding her opinion, even though she had made a diagnosis of fibromyalgia with supporting tender points findings.

While "ERISA Plan administrators need not give special deference to a claimant's treating physician," they "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Paese, 449 F.3d at 442* (citing *Black & Decker*

---

[28] Plaintiff argues that Sedgwick's insistence on tender points findings was out of date and unreasonable because the American College of Rheumatology ("ACR") revised its criteria for diagnosing fibromyalgia in 2010 and eliminated the tender points test in favor of a broader assessment of pain and other symptoms. (Pl. Br., p. 34; *see* Dkt. No. 98-5, p. 140). The Court notes that there does not appear to be a uniform consensus on testing for fibromyalgia: the Social Security Administration uses both the 2010 ACR criteria and the earlier tender points criteria as alternative paths in diagnosing fibromyalgia. *See* SSR 12-2p: Titles II and XVI: Evaluation of Fibromyalgia, Policy Interpretation Ruling, 2012 SSR LEXIS 1, 2012 WL 3104869; *Selian v. Astrue*, 708 F.3d 409, 419-420 (2d Cir. 2013); *Campbell v. Colvin*, No.13 Civ. 451, 2014 U.S. Dist. LEXIS 179371, at *17 n.17, 2015 WL 73763, at *5 n.17 (N.D.N.Y. Nov. 14, 2014) (*Report & Recommendation adopted by* 2015 U.S. Dist. LEXIS 511, 2015 WL 73763 (N.D.N.Y. Jan. 6, 2015)).

*Disability Plan*, 538 U.S. at 834). "An administrator may, in exercising its discretion, weigh competing evidence, but it may not…cherry-pick the evidence it prefers while ignoring significant evidence to the contrary." *Winkler v. Metro. Life Ins. Co.*, 170 Fed. App'x. 167, 168 (2d Cir. 2006); *see also Ricca v. Prudential Ins. Co. of Am.*, 747 F. Supp. 2d 438, 445 (E.D. Pa. Sept. 30, 2010) ("An administrator may not selectively consider and credit medical opinions without articulating its thought processes for doing so.").

Defendants' current critique of Dr. Dorsey and the accuracy of her diagnosis, Defs. Br. at pp. 35-36, is beside the point; Plaintiff was entitled to, but did not receive, consideration of Dr. Dorsey's fibromyalgia diagnosis with respect to Plaintiff's second STD claim. The Administrative Record reveals no consideration; instead Sedgwick only considered Dr. Yovanoff's opinion and used it as the exclusive basis for the initial decision to deny the claim. Therefore, this decision was arbitrary and capricious because it was not based on relevant factors and substantial evidence.

Nor does Sedgwick's second reason for denying Plaintiff's second STD claim provide a reasonable basis for its decision. Although Sedgwick stated that Plaintiff did not have a new Medical Condition, it did not consider Dr. Dorsey's APS and notes in reaching that conclusion, and thus ignored Plaintiff's fibromyalgia diagnosis. Defendants now argue that Plaintiff should have submitted Dr. Dorsey's September 13, 2010 office note, which stated that Plaintiff "seems to definitively have fibromyalgia," in connection with her first STD claim, and Plaintiff was therefore precluded from making a second STD claim based on fibromyalgia. (Defs. Br., pp. 42-43). But that reason was never articulated by Sedgwick, and any after-the-fact rationale is not relevant to reviewing the Administrator's decision. *See Martin v. Hartford Life & Accident Ins.*

*Co.*, 478 Fed. App'x. 695, 698 (2d Cir. 2012); *Curry v. Am. Int'l Group, Inc. Plan No. 502*, 579

F. Supp. 2d 413, 422 (S.D.N.Y. 2008).[29]

### 3) The Denial of Plaintiff's Second STD Claim Appeal Was Arbitrary and Capricious.

### a. Sedgwick Failed to Give Adequate Notice.

It is undisputed that Sedgwick failed to issue a formal letter regarding its appeal decision,

as expressly required by ERISA and the Plan. *See* 29 U.S.C. § 1133(1) (the Plan shall "provide

adequate notice in writing . . . setting forth the specific reasons for such denial, written in a

manner calculated to be understood by the participant."); BPN 231 ("The Claims Administrator

will respond in writing…to all claims, whether the claim is granted or denied). Therefore,

Plaintiff was not afforded adequate notice of the reasons for the denial of her appeal. This failure

alone renders Sedgwick's decision to deny Plaintiff's appeal arbitrary and capricious. *See*

*Hobson*, 574 F.3d at 87; *see also Dzidzovic v. Bldg. Serv. 32B-J Health Fund*, No. 02 Civ. 6140,

2006 U.S. Dist. LEXIS 55546, at *30, 2006 WL 2266501, at *11 (S.D.N.Y. Aug. 7, 2006)

(finding Administrator's "failure to provide adequate notice under ERISA, and the consequent

failure to afford plaintiff a 'full and fair review' of the decision to deny benefits, was arbitrary

and capricious as a matter of law.").

### b. The Denial Was Based On Erroneous Information.

---

[29] Defendants also appear to argue that Plaintiff's second STD claim involved re-opening her first STD claim for the limited purpose of determining whether she had a new diagnosis of fibromyalgia as of October 28, 2010. (Defs. Br., p. 43). However, the record shows that Plaintiff initiated a new claim based on a reported fibromyalgia diagnosis, under the separate claim number 30101206852-0001, and it was this second claim that was re-opened after being temporarily closed. (BPN 400-405). Therefore, Plaintiff was not seeking "limitless review" of her first claim or more than the Plan allowed; the cases cited by Defendants are inapposite because they dealt with Administrators that declined to re-open a claim that had already been fully evaluated and appealed administratively. Here, Plaintiff initiated a new claim, and the Court finds nothing in the ERISA statute or the Plan documents that bars multiple claims for benefits. The Plan states only that a claim must be brought within one year "after the date you know or reasonably should know the principal facts upon which your claim is based." (BPN 231).

Sedgwick's rationale for its decision, which was captured in the claim notes and allegedly communicated to Plaintiff by telephone, also demonstrates that the denial of Plaintiff's appeal was arbitrary and capricious. Plaintiff's attorney initiated the appeal on June 22, 2011, writing that the "basis of this appeal is that Ms. Delprado is diagnosed with fully disabling and debilitating fibromyalgia." (BPN 938). The appeal pointed out that Dr. Dorsey had diagnosed fibromyalgia, and that Sedgwick's "January 20, 2011 denial makes no reference to Dr. Dorsey's records." (BPN 939). The appeal also enclosed an additional office note from Dr. Dorsey repeating the diagnosis, as well as a report from Dr. Prezio diagnosing fibromyalgia after an independent medical examination for the Social Security Administration. (*Id*.).

In reviewing the appeal, Sedgwick sought to "determine if [employee] satisfies eligibility requirements based on [employee]'s reports of new diagnosis and, if so, if medical supports disability." (BPN 311). Sedgwick obtained another peer review from Dr. Payne, this time based on records including notes and reports from Dr. Dorsey, Dr. Prezio, Dr. Huyck, Dr. Fishel, and Dr. Yovanoff. (BPN 1030). In his synopsis, Dr. Payne wrote that Plaintiff had a "history of fibromyalgia that was initially diagnosed in the fall of 2009." (BPN 1031). Dr. Payne does not state who allegedly diagnosed Plaintiff with fibromyalgia in the fall of 2009. (*See id*.). As previously noted, there is nothing in the record that supports this assertion; Dr. Payne did not even review any records from 2009 in preparing his report. (BPN 1030). It appears to be a typographical error since Plaintiff's first diagnosis of fibromyalgia was in the fall of 2010.[30] With respect to whether the records documented a disability, Dr. Payne noted that the records

---

[30] Dr. Huyck initially raised the possibility in January 2010 when he speculated that Plaintiff might have a "fibrositic syndrome." (BPN 608). In his September 27, 2010 report regarding Plaintiff's first STD claim, Dr. Payne noted that Plaintiff's exam findings from January 2010 to August 27, 2010 were "consistent with a form of fibromyalgia syndrome." (BPN 653-654). On September 13, 2010, Dr. Dorsey concluded that Plaintiff "seem[ed] to definitely have fibromyalgia" (BPN 774), and stated a diagnosis of fibromyalgia in her APS of January 7, 2011. (BPN 818).

reflected "diffuse and chronic pain" and "reports of tender points," but concluded that there were "no findings that support any impairment in functionality." (BPN 1032).

Sedgwick seized on Dr. Payne's erroneous assertion that Plaintiff had a fibromyalgia diagnosis since the fall of 2009, and rejected Plaintiff's appeal on a technicality—that it was not a new condition—instead of reviewing the merits of her claim.[31] Sedgwick's claim notes state the rationale: "This claim was opened administratively under the premise that [employee] had a new [diagnosis] of fibromyalgia. However, upon disability investigation, it was concluded that this was not a new [diagnosis] and would therefore fall under the absence of [employee]'s previous claim." (BPN 351). Sedgwick cited Dr. Payne's peer review report for the fact that Plaintiff's "fibro [diagnosis] was established in 2009." (*Id.*).

Thus, having re-opened the claim specifically to consider a fibromyalgia diagnosis, Sedgwick refused to evaluate whether Plaintiff was disabled due to fibromyalgia. Instead, Sedgwick denied the claim based solely upon Dr. Payne's erroneous assertion that "fibromyalgia was initially diagnosed in the fall of 2009." (BPN 1031). Defendants continue to rely on this error, arguing in their brief that since Plaintiff had fibromyalgia since 2009, her medical condition for the second STD claim was the same as her medical condition in the first STD claim where she had already lost her appeal, and therefore, she was not entitled to a "second bite at the apple." (Defs. Br., p. 43).

Plaintiff, however, did not have a fibromyalgia diagnosis when she filed her first STD claim in August 2010; that claim was reviewed for the diagnoses of "osteoarthritis, depression,

---

[31] Defendants have not cited any part of the Plan supporting or explaining this technical basis for denying the claim. The Plan does contain a provision for the "Effect of a Subsequent Disability", which states: "If you return to work at UnitedHealth Group after a Disability, then experience another Disability, the two events are considered a continuous Disability if: [t]he second Disability is caused by the same Medical Condition that caused your prior Disability or is related to that Medical Condition; and [t]he subsequent Disability occurs *within 30 days* of your last approved day of Disability." (BPN 191). However, Plaintiff did not return to work and was never approved by Sedgwick for disability, and therefore, this section of the Plan is not applicable.

hypertension and elevated cholesterol." (BPN 399). Because Sedgwick relied on a factual

premise that was not supported by substantial evidence to deny Plaintiff's claim, the Court

concludes that the denial on appeal was arbitrary and capricious.

### 4) The Final Denial of Plaintiff's Second STD Claim Was Arbitrary and Capricious.

Plaintiff's second level appeal was referred to the UHG Disability Appeals Committee,

which upheld the denial on February 20, 2012, concluding that the "SPD and the STD claim

process were followed and that there is no basis to overturn the previous decisions." (BPN

1165). Defendants argue that the denial was based on an "administrative issue," and "was not

determined on the merits of whether or not Plaintiff was functionally disabled." (Defs. Br., p.

44). However, the record shows that the Committee made the decision based on both the merits

of Plaintiff's second STD claim, and also the technicality that it was not a new claim:

> **First, the claim was denied by the claim team because medical did not substantiate disability. On appeal, however, it was determined that the employee did not file this claim for a new condition so the previous denial was upheld although it was for a different reason than the initial denial.** Without any new information to consider, we would uphold the previous denial decisions but we aren't clear if the appeal was because this employee feels this is a distinct condition/diagnosis that merited a new claim or if the employee feels that her disability was supported. Perhaps she feels both but I want to be clear that we only evaluated to say that **nothing submitted clarified this and we did not feel that anything on the case merited overturning the previous decisions so the denial, for whatever reason, is upheld.**

(BPN 1175) (emphasis added).

As explained *supra* in Part III(B)(3)(b), the technical violation which barred Plaintiff's

claim was based on erroneous information. Therefore, the decision to uphold denial on that basis

was also arbitrary and capricious.

On the merits, it appears that the Committee adopted Dr. Payne's conclusion that

although Plaintiff did have fibromyalgia, she was not disabled because "there no findings that

support any impairment in functionality" that prevented her from doing her job. (BPN 1032).

Plaintiff argues that the Committee's reliance on Dr. Payne's report was arbitrary and capricious.

(Pl. Br., p. 43). The Court finds that the Committee's decision to ultimately deny Plaintiff

benefits for her second STD claim was unreasonable for several reasons.[32]

### a. The Opinions of Plaintiff's Physicians Were Not Properly Considered.

In making its decision, the Committee had opinions from three different doctors who

examined Plaintiff and stated that she was disabled. Dr. Dorsey's APS diagnosed fibromyalgia

and stated that she was totally disabled. (BPN 819-820). For the "Objective" supportive

findings, which included physical examination results and test results, Dr. Dorsey listed "Tender

points." (BPN 819). In response to the question "How does this affect the patient's ability to

work?", Dr. Dorsey stated: "Severe Pain. She gets fatigued. Must avoid lifting, bending, sitting,

walking." (*Id*.). Thus, according to Dr. Dorsey, Plaintiff could not perform the sedentary duties

of a Case Manager because the pain and fatigue prevented her from even sitting to do her job.

Dr. Yovanoff had also provided an APS stating that Plaintiff was totally disabled. (BPN

832). While Dr. Yovanoff did not diagnose fibromyalgia, he stated unequivocally to Sedgwick's

NCM that he "believes the [employee] is disabled because of pain because she states she is

disabled." (BPN 373). Dr. Yovanoff further stated that Plaintiff was unable to concentrate due

to the pain. (*Id*.).

The Committee also had the report from Dr. Prezio, who found Plaintiff disabled due to

fibromyalgia. (BPN 968-971). Dr. Prezio's physical exam noted trigger points "throughout all

the major muscle groups, and "[w]ith each maneuver there is increased pain and sensitivity noted

in the muscle groups and in the joints." (BPN 970). He concluded that Plaintiff had "mild

---

[32] Although the Committee did not explain the basis for its decision in any detail, it found no reason to overturn the previous denials and thereby adopted the bases for those decisions.

restriction for prolonged standing, walking, squatting, kneeling, heavy lifting or bending because of the fibromyalgia complaints present at this time." (BPN 971). The fact that Plaintiff's doctors relied upon her subjective complaints does not undermine their opinions about her functional limitations, as a "patient's report of complaints, or history, is an essential diagnostic tool." *Green-Younger v. Barnhart*, 335 F.3d 99, 107 (2d. Cir. 2003) (citation omitted).

Administrators may not arbitrarily refuse to credit reliable evidence, including the opinions of treating physicians. *Paese*, 449 F.3d at 442 (citing *Black & Decker Disability Plan*, 538 U.S. at 834). Moreover, findings by the Social Security Administration, such as Dr. Prezio's report, may be considered when determining disability under ERISA. *Durakovic v. Bldg. Serv. 32 BJ Pension Fund*, 609 F.3d 133, 141 (2d Cir. 2010); *see also Hobson*, 574 F.3d at 92 ("encourage[ing] plan administrators, in denying benefits claims, to explain their reasons for determining that claimants are not disabled where the SSA arrived at the opposite conclusion"). While the opinions of treating physicians and SSA findings are accorded no special weight, they cannot be disregarded completely.

The only evidence contrary to these examining doctors' opinions was Dr. Payne's report. Although Dr. Payne reviewed the records of Dr. Yovanoff, Dr. Dorsey, and Dr. Prezio, all of whom examined Plaintiff and opined that she suffered from debilitating pain and fatigue, there is no indication that he considered their opinions that she was disabled; rather, his report is founded on an alleged absence of evidence. Dr. Payne did not examine Plaintiff, and his analysis of her medical records was incomplete and fundamentally flawed, as discussed *supra* in Part III(B)(3)(b). Therefore, his report does not constitute substantial evidence for the Committee's decision. *See Novick v. Metro. Life Ins. Co.*, 914 F. Supp. 2d 507, 526 (S.D.N.Y. 2012) (finding that Administrator's decision was not based on substantial evidence where it "chose to rely on

conclusions reached by Dr. Payne, a doctor who never examined [claimant] and whose opinion was founded on an absence of record evidence, even though [her] treatment physicians who offered opinions as to whether or not she was disabled, concluded that she was in fact disabled.").  In the absence of substantial evidence, the Committee's decision to affirm the denial of STD benefits was arbitrary and capricious.

### b. Plaintiff's Subjective Symptoms Were Not Properly Considered.

Plaintiff argues that Sedgwick failed to consider her subjective complaints of disabling pain and fatigue throughout the decision and appeal process.  (*See* Pl. Br., pp. 37, 44).  While Dr. Payne references these symptoms, there is no evidence that he considered the symptoms in assessing whether she was disabled.  Dr. Payne noted exam findings of tender points and "mention of diffuse and chronic pain," but then stated that her physical exam findings were essentially normal, and concluded "there is no evidence in the provided medical information of restrictions or limitations from a rheumatology viewpoint."  (BPN 1031-32).  Much the same, when Sedgwick initially denied Plaintiff's second STD claim, the denial rationale stated, among other things, that Dr. Yovanoff "stated her subjective complaints of pain is [sic] what is preventing her from performing her sedentary (work at home) duties of a case manager. No objective findings to support what she cannot perform sedentary duties."  (BPN 368-369).  There is nothing in the record adopted by the Committee that explains why Plaintiff's subjective complaints were rejected.

However, it is well established that "the subjective element of pain is an important factor to be considered in determining disability."  *Connors v. Conn. Gen. Life Ins. Co.*, 272 F.3d 127, 136 (2d Cir. 2001) (quoting *Mimms v. Heckler*, 750 F.2d 180, 185 (2d Cir. 1984)).  An Administrator "must do more than simply point to the subjective nature of the evidence when

denying [a] claim. It must either assign some weight to the evidence or provide a reason for its

decision not to do so." *Miles*, 720 F.3d at 487. "[I]t is arbitrary and capricious to disregard

evidence simply because it is subjective." *Id*. at 486; *see also Thurber v. Aetna Life Ins. Co.*, 712

F.3d 654, 660 (2d Cir. 2013) (noting that the plan administrator must give "sufficient attention to

. . . subjective complaints"); *Krizek v. Cigna Grp. Ins.*, 345 F.3d 91, 101-02 (2d Cir. 2003)

(noting that it is error to reject subjective evidence simply because it is subjective); *Marcus v.

Califano*, 615 F.2d 23, 27 (2d Cir. 1979) ("[T]he subjective evidence of appellant's pain, based

on her own testimony and the medical reports of examining physicians, is more than ample to

establish her disability, if believed.").

Subjective evidence is important in evaluating fibromyalgia because its chief symptoms

of pain and fatigue are difficult to objectively measure. In *Green-Younger*, for example, an

Administrative Law Judge recognized a plaintiff's fibromyalgia diagnosis, but rejected her

disability claim based on the lack of objective evidence of functional limitations. 335 F.3d at

108. After the district court affirmed, the Second Circuit reversed, finding that fibromyalgia

eludes objective measurement:

> [I]n stark contrast to the unremitting pain of which fibrositis patients complain,
> physical examinations will usually yield normal results--a full range of motion, no
> joint swelling, as well as normal muscle strength and neurological reactions.
> Hence, the absence of swelling joints or other orthopedic and neurologic deficits
> is no more indicative that the patient's fibromyalgia is not disabling than the
> absence of a headache is an indication that a patient's prostate cancer is not
> advanced.

*Id*., at 108-109; *see also Lanoue v. Prudential Ins. Co. of Am.*, No. 07 Civ. 1756, 2009 U.S. Dist.

LEXIS 95086, at *12, 2009 WL 3157545, at *5 (D. Conn. Sept. 25, 2009) (noting that

administrator's "insistence on objective evidence of functional deficits unrelated to debilitating

pain meant that [administrator] could never determine, on the basis of fibromyalgia alone, that

[claimant] was disabled"); *Somogy v. Comm'r of Soc. Sec.*, 366 Fed. App'x. 56, 64 (11th Cir. 2010) ("Given the nature of fibromyalgia, a claimant's subjective complaints of pain are often the only means of determining the severity of a patient's condition and the functional limitations caused thereby.").

The Committee erred in its decision by disregarding Plaintiff's subjective symptoms of disabling pain and fatigue, without providing any reason for that decision. *See Miles*, 720 F.3d at 486; *Thurber*, 712 F.3d at 660; *Lanoue*, 2009 U.S. Dist. LEXIS 95086, at *18, 2009 WL 3157545, at *7. Accordingly, the Committee's ultimate decision to reject Plaintiff's second STD claim on the merits, without addressing her subjective symptoms relating to fibromyalgia, was arbitrary and capricious.

### c.    Plaintiff Was Not Provided Adequate Notice.

Moreover, even assuming *arguendo* the Committee reasonably adopted Dr. Payne's opinion that Plaintiff failed to show objective findings of functional impairment, Plaintiff never received specific notice of this requirement at any stage of her case. The Second Circuit has explained ERISA's notice requirements as follows:

> Section 503(1) of ERISA contains a general requirement whereby, upon denying a claim for benefits, a plan administrator must provide the claimant with "adequate notice in writing . . . setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant." 29 U.S.C. § 1133(1). ERISA regulations further require that the administrator furnish the claimant with a "description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary . . . ." 29 C.F.R. § 2560.503-1(g)(1)(iii).

*Hobson*, 574 F.3d at 87. The purpose of the notice requirement is to "provide claimants with enough information to prepare adequately for further administrative review or an appeal to the federal courts." *Id.* (citing *Juliano v. Health Maint. Org. of NJ*, 221 F.3d 279, 287 (2d Cir. 2000)). In *Hobson*, the Court found that the Administrator "acted within its discretion in

requiring some objective evidence that [claimant] was disabled from performing in a sedentary capacity," where it had previously been specifically requested.  *Id*. at 88.

In contrast, Plaintiff never received any specific request for evidence of functional impairment.  On December 30, 2010, the NCM noted that Plaintiff's available medical records "document subjective complaints of chronic pain and fatigue without any objective findings such as muscle atrophy, muscle spasm, sensory or strength loss, range of motion deficits, abnormal movement or any objective findings to substantiate any functional disability."  (BPN 395).  But the denial letter on January 20, 2011 simply stated that "the medical information submitted does not demonstrate that you are unable to perform the material duties of your own occupation." (BPN 880).  And when Sedgwick advised Plaintiff via telephone on January 21, 2011 that it could not authorize benefits, Plaintiff was only told that the medical records did not support a fibromyalgia diagnosis.  (BPN 367-368).  Therefore, when she appealed, Plaintiff included those records supporting her fibromyalgia diagnosis.  (BPN 938).  Since the second level appeal was a closed file review, Plaintiff could not submit any additional medical records.

Without specific notice requesting evidence of functional impairment, Plaintiff had no opportunity to perfect her claim and prepare for administrative review.  While Dr. Payne found "no evidence of synovitis, weakness, or atrophy," and stated that there were "no physical findings reported that would support any impairment in functionality" (BPN 1032), and the Committee adopted his conclusions, Sedgwick did not notify Plaintiff  that such exam findings were necessary.  Accordingly, the Committee's ultimate decision to deny benefits, without providing adequate notice of the evidence required, was unreasonable and constitutes an abuse of discretion.  *See Novick*, 914 F. Supp. 2d at 526 ("if [the Administrator] desired specific testing or analysis as to functional impairment, it should have said so.").

**C.      Plaintiff's LTD Claim Was Denied Unreasonably.**

Since the decision that Plaintiff was not disabled under her second STD claim for

fibromyalgia was arbitrary and capricious, the decision to deny her contingent LTD claim was

also unreasonable.  Sedgwick initially denied Plaintiff's LTD claim on the basis that she did not

qualify for LTD benefits because she had "not satisfied the waiting period" required by the Plan

and defined as the "180 calendar day period of time that starts on the first day as of which the

Claims Administrator [determines] that you are disabled."  (BPN 934-935).  Sedgwick denied

Plaintiff's appeal on the same basis that she "was not disabled in excess of the waiting period."

(BPN 1111).  The Committee's denial of Plaintiff's second level LTD appeal simply stated that

there was "no basis to overturn the previous decisions."  (BPN 1164).  Thus, the decision was

predicated on the fact that the Administrator never determined that Plaintiff was disabled for

STD benefits, which was a condition precedent for LTD benefits.

The LTD Plan states it "pays benefits only if the Claims Administrator determines that

you are Disabled, are receiving the Regular and Appropriate Care of a Physician and have

satisfied the LTD Waiting Period."  (BPN 79, 196).  Plaintiff argues that the LTD Plan does not

require a claimant to have a STD claim approved, and therefore, that Defendants also erred in not

making a separate assessment of her disability on the merits for the LTD claim.  (Pl. Br., p. 46).

However, the LTD Plan makes clear that the 180 day LTD Waiting Period is co-extensive with

the maximum 180 day STD period of benefits, and that the Claims Administrator must first

determine disability in the context of an STD claim.  (*See* BPN 82, 94, 199, 212 (discussing

transition from STD to LTD benefits)).  The decision to deny Plaintiff's LTD claim based on the

waiting period requirement was arbitrary and capricious because Defendants' errors in deciding

Plaintiff's underlying STD claim, discussed *supra* in Part III(B), prevented her from possibly

satisfying the condition precedent of being found disabled for 180 days. *See Novick v. Metro. Life Ins. Co.*, 764 F. Supp. 2d 653, 665 (S.D.N.Y. 2011) ("It is well-settled law that 'a condition precedent may be excused if the party whose performance is predicated on that condition somehow blocks its occurrence.'") (quoting *Cross & Cross Properties, Ltd. v. Everett Allied Co.*, 886 F.2d 497, 501 (2d Cir. 1989)); *see also Duarte v. Aetna Life Ins. Co.*, No. 13 Civ. 0492, 2014 U.S. Dist. LEXIS 59532, at *26, 2014 WL 1672855, at *10 (C.D. Cal. Apr. 24, 2014) (finding error in Administrator's decision to deny LTD benefits based on plaintiff's failure to satisfy waiting period where it improperly decided plaintiff's underlying STD claim).

## D.     Sedgwick's ERISA Liability

Although Sedgwick made many of the decisions regarding Plaintiff's claims for benefits, Defendants argue that Sedgwick cannot be liable under ERISA because it is a claims administrator for UHG, and not the Plan Administrator ultimately responsible for the benefits. (Defs. Br., p. 48). Under the Plan, UHG is the named Plan Administrator, and it delegated its authority to determine claims to Sedgwick for STD benefits and for the first twenty-four months of LTD benefits. (Defs. SMF, p. 10, ¶¶ 11, 20). Since Sedgwick is only the claims administrator, this Court previously held that it could not be found liable under 29 U.S.C. § 1132(c)(1)(B) because the Plan designated UHG and not Sedgwick as the Plan Administrator. (Dkt. No. 33, p. 11). For the same reasons, Sedgwick cannot be liable under § 1132(a)(1)(B) because only ERISA plans, plan trustees, and plan administrators may be sued for recovery of benefits. *See Chapman v. Choicecare Long Island Disability Plan*, 288 F.3d 506, 509 (2d Cir. 2002); *Leonelli v. Pennwalt Corp.*, 887 F.2d 1195, 1199 (2d Cir. 1989) ("In a recovery of benefits claim, only the plan and the administrators and trustees of the plan in their capacity as

such may be held liable"); *Fredericks v. Hartford Life Ins. Co.*, 488 F. Supp. 2d 210, 212 (N.D.N.Y. 2007).

Plaintiff argues that although Sedgwick is not liable for benefits, "it would be liable as the claims administrator for attorneys' fees, costs and disbursements awarded in this action since it was Sedgwick's decision making and arbitrary choices that resulted in this action." (Pl. Br., p. 50). However, Plaintiff cites no authority for this proposition, and it would be illogical to allow recovery for attorneys' fees against an entity that is not liable for recovery of benefits under ERISA, and therefore, not a proper party. The ERISA statute states: "In any action under this title…by a participant, beneficiary, or fiduciary, the court in its discretion my allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g)(1). Since Sedgwick is not a proper party, it cannot be liable for attorneys' fees. Plaintiff also argues that Sedgwick is "subject to declaratory direction by the Court to render decisions under the terms of each Plan with or without remand." (Pl. Br., p. 50). However, the Court will not issue a declaratory judgment, as discussed *infra*, and UHG is the party responsible for ultimately paying benefits.

### E.    Plaintiff's Request For Declaratory Relief

Defendants have moved for summary judgment against Plaintiff's claims for declaratory relief (Counts X-XII of the Amended Complaint), arguing that the "DJA Counts are essentially duplicative and superfluous of the direct, coercive claims [for civil enforcement under ERISA] already asserted and extant in this litigation." (Defs. Br., p. 51). Plaintiff did not respond to this argument in her cross-motion for summary judgment, but repeated her request for declaratory judgment. (Pl. Br., p. 4). The Court finds that Plaintiff's case is not suitable for declaratory relief given the more appropriate remedy of direct civil enforcement and recovery of benefits, specifically provided by ERISA and sought in this action.

The gravamina of this case are Plaintiff's ERISA claims to recover STD and LTD benefits under 29 U.S.C. § 1132(1)(B).  (*See* Counts I-III of the Amended Complaint, Dkt. No. 11, ¶¶ 154-162).  Since it is necessary for the Court to resolve the rights and obligations of the parties to render a summary judgment decision on Plaintiff's claims to recover benefits, Plaintiff's claims for declaratory judgment are duplicative and superfluous.  The basic purpose of declaratory judgment is to resolve the rights and obligations of parties "in cases involving an actual controversy that not reached the stage at which either party may seek a coercive remedy, or in which the party entitled to such a remedy fails to sue for it."  *United States v. Doherty*, 786 F.2d 491, 498 (2d Cir. 1986) (citation omitted).  Here, Plaintiff has already sought a coercive remedy, and therefore, her claims for declaratory relief are dismissed as duplicative and moot.  *See GMC v. Dealmaker, LLC*, No. 07 Civ. 141, 2007 U.S. Dist. LEXIS 62383, at *10, 2007 WL 2454208, at *4 (N.D.N.Y. Aug. 23, 2007) (dismissing declaratory judgment claim where claim "seeking a declaration that the Agreement was breached is duplicative of this breach of contract claim.").

## IV.  SUMMARY

The Court finds that there is no issue of fact that Defendants' decision to deny Plaintiff's first STD claim was reasonable based on Plaintiff's unclear diagnosis at the time.  However, there is also no issue of fact that Defendants' decision to deny Plaintiff's second STD claim was arbitrary and capricious.  After Plaintiff was diagnosed with fibromyalgia and filed her second STD claim, Defendants committed myriad errors in making their decision, including not properly considering her subjective symptoms of pain and fatigue and the opinions of the doctors who examined her that she was disabled, relying on the flawed report of Dr. Payne, failing to issue a

formal determination letter regarding her appeal, and failing to provide adequate notice of what information was necessary to show disability due to fibromyalgia.

There is also no issue of fact that Defendants' decision to deny Plaintiff's LTD claim was arbitrary and capricious. Defendants rejected the claim on the basis that she had not satisfied the required waiting period, and therefore, the claim was never considered on the merits. The decision was unreasonable because Defendants' own errors in deciding Plaintiff's underlying second STD claim prevented her from possibly satisfying the condition precedent of being found disabled for 180 days. Accordingly, Plaintiff's medical records were never evaluated to determine whether they documented continued disability after the waiting period, and Plaintiff never had the opportunity to present additional records showing continuing disability.

## V.  THE APPROPRIATE REMEDY

Plaintiff requests an award of STD and LTD benefits. That relief, however, is not warranted at this time. Second Circuit precedent "makes clear that even where we conclude a plan administrator's finding was arbitrary and capricious, we will typically not substitute our own judgment, but rather will return the claim for reconsideration unless we 'conclude that there is no possible evidence that could support a denial of benefits.'" *Miles*, 720 F.3d at 490 (quoting *Miller*, 72 F.3d at 1074); *see also Novick*, 914 F. Supp. 2d at 528 ("It is not the task of the federal district courts [to] function as substitute plan administrators.").

Although the decisions by Defendants to deny Plaintiff's second STD claim and LTD claim were arbitrary and capricious, remand is necessary for Defendants to properly administer the Plan and fairly evaluate these claims based on *all* the medical records Plaintiff provided and any other relevant evidence. Due in part to Defendants' flawed decision-making process, the existing record does not contain sufficient evidence to properly assess Plaintiff's eligibility for

STD and LTD benefits.  Thus, the Court cannot conclude that "no new evidence could produce a reasonable conclusion permitting denial of the claim or remand would otherwise be a useless formality."  *Miller*, 72 F.3d at 1071 (internal quotations omitted).

Remand will afford Defendants the opportunity to consider all the relevant evidence under the appropriate standards.  Defendants may choose to examine Plaintiff, and Plaintiff may supplement her medical records with any additional evidence relevant to her claims.  *See Miller*, 72 F.3d at 1074 (remanding for reconsideration based on additional evidence presented by both sides); *Magee v. Metro. Life Ins. Co.*, 632 F. Supp. 2d 308, 322 (S.D.N.Y. 2009) ("To insure effective review, Magee may supplement his file with any additional evidence and MetLife shall treat Magee's claim as a new claim affording no deference to the initial adverse determination."); *Maida v. Life Ins. Co. of N. Am.*, 949 F. Supp. 1087, 1093 (S.D.N.Y. 1997) (remanding for reconsideration based on examination of claimant and additional evidence).

Defendants are reminded that a benefit determination is a fiduciary act, and they owe plan beneficiaries "a special duty of loyalty."  *Miles*, 720 F.3d at 490 (citing *Glenn*, 554 U.S. at 111).  "This duty requires [the Plan Administrator] to interpret and apply plan terms 'solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of . . . providing benefits to participants and their beneficiaries.'"  *Id*. (quoting 29 U.S.C. § 1104(a)(1)(A)(i).  On remand, Defendants "may not adopt an adversarial approach toward [Plaintiff] in the benefits determination."  *Id*.  Defendants shall provide a full and fair consideration of Plaintiff's claims.

The Court declines to order the matter stayed and retain jurisdiction during the remand.  However, Plaintiff may move to re-open this action for further relief, if it becomes necessary, without having to pay new filing fees.  *See LeClair v. Liberty Life Assur. Co.*, No. 12 Civ. 6066,

2013 U.S. Dist. LEXIS 93049, at *11, 2013 WL 3338685, at *4 (W.D.N.Y. July 2, 2013);

*Rankins v. Long Term Disability Plan for Emps. of the Franklin Ins. Co.*, 6 F. Supp. 2d 988, 992

(C.D. Ill. 1998).

## VI. ATTORNEYS' FEES

Plaintiff also seeks an award of attorneys' fees under § 29 U.S.C. 1132(g)(1), which

grants the Court discretion to award "reasonable attorneys' fees" in ERISA actions. The

Supreme Court has held that attorneys' fees in ERISA cases may only be awarded to a

beneficiary who has obtained "some degree of success on the merits." *Hardt v. Reliance Std.*

*Life Ins. Co.*, 560 U.S. 242, 245 (2010) (citation omitted). Under Second Circuit precedent, the

Court may also consider the following factors:

> (1) the degree of opposing parties' culpability or bad faith; (2) ability of opposing
> parties to satisfy an award of attorneys' fees; (3) whether an award of attorneys'
> fees against the opposing parties would deter other persons acting under similar
> circumstances; (4) whether the parties requesting attorneys' fees sought to benefit
> all participants and beneficiaries of an ERISA plan or to resolve a significant legal
> question regarding ERISA itself; and (5) the relative merits of the parties'
> positions.

*Donachie v. Liberty Life Assur. Co.*, 745 F.3d 41, 46 (2d Cir. 2014) (citing *Hardt*, 560 U.S. at

249 n.1). In this case, even though Plaintiff is not entitled to summary judgment, she has

obtained some degree of success on the merits in showing Defendants' decisions on her second

STD claim and LTD claim to be arbitrary and capricious and requiring remand. *See Winkler v.*

*Metro. Life Ins. Co.*, No. 03 Civ. 9656, 2006 U.S. Dist. LEXIS 70180, at *12, 2006 WL

2850247, at *3 (S.D.N.Y. Sept. 28, 2006) ("Attorneys' fees in ERISA cases are not granted

based on counsel's efforts to obtain disability benefits before a plan administrator, but based on

their efforts to vindicate their clients' rights in court."); *see also Strope v. Unum Provident*

*Corp.*, No. 06 Civ. 628, 2010 U.S. Dist. LEXIS 117877, at *6-7, 2010 WL 4451548, at *2

(W.D.N.Y. Nov. 4, 2010) (collecting cases where attorneys' fees were awarded after claimant obtained remand).

The Court finds that all five of the factors identified by the Second Circuit weigh in Plaintiff's favor. Defendants wrongfully denied Plaintiff the opportunity for a full and fair review, forcing her to bring the present lawsuit. The nature of Defendants' arbitrary and capricious conduct, including Sedgwick's refusal to consider Plaintiff's fibromyalgia claim on the erroneous, technical ground that it was not a new diagnosis and then failure to even issue a written appeal decision, weighs in favor of granting Plaintiff's request for attorneys' fees. Considering the cumulative errors of Defendants in processing Plaintiff's claims, the relative merits of the parties' positions are little in doubt. Defendants should be able to satisfy the award, and requiring them to do so may encourage better compliance with ERISA, thus conferring a benefit on future claimants. Therefore, Plaintiff is entitled to an award of attorneys' fees and costs expended in furtherance of her second claim for STD benefits and her claim for LTD benefits up to and including the date of this opinion. *See Magee*, 632 F. Supp. at 322. In the event the parties cannot agree on reasonable attorneys' fees, Plaintiff shall submit an application to the Court with sufficient documentation to determine the amount of the award.

## VII.     CONCLUSION

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 89-1) is **GRANTED** in part and **DENIED** in part; and it is further

**ORDERED** that Plaintiff's motion for summary judgment (Dkt. No. 98-1) is **GRANTED** in part and **DENIED** in part; and it is further

**ORDERED** that Plaintiff's motion to strike to strike all or parts of the Affidavits of Jessica Brandhorst and William J. Anthony is **DENIED**; and it is further

**ORDERED** that Counts I, V, VI, VII, VIII, and IX, X, XI, and XII of the Amended Complaint are hereby **DISMISSED**; and it is further

**ORDERED** that Defendant Sedgwick Claims Management Services, Inc. is hereby **DISMISSED** as a defendant in this action; and it is further

**ORDERED** that Plaintiff's claim for STD benefits under Claim No. 30101206852-0001 in Count II of the Amended Complaint is remanded for reconsideration by Defendants; and is further

**ORDERED** that Plaintiff's claim for LTD benefits under Claim No. B085705482-0001-02 in Count III of the Amended Complaint is remanded for reconsideration by Defendants; and it is further

**ORDERED** that if Plaintiff is unsuccessful at the administrative level following remand, she may move to re-open this case and shall not have to pay a new filing fee; and it is further

**ORDERED** that Plaintiff's request for attorneys' fees is granted, and the parties are directed to confer regarding reasonable attorneys' fees, and in the event the parties cannot agree, Plaintiff shall file an application for attorneys' fees with the Court on or before May 18, 2015, with documentation supporting the amount requested; and it is further

**ORDERED** that the Clerk of the Court is directed to close this case, and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum-Decision and Order to the parties.

**IT IS SO ORDERED**.

April 17, 2015
Syracuse, New York

Brenda K. Sannes
U.S. District Judge